# IN THE SUPREME COURT OF IOWA

No. 15–0974

Filed June 2, 2017

Amended August 8, 2017

**PAMELA PLOWMAN** and **JEREMY PLOWMAN,**

Appellants,

vs.

**FORT MADISON COMMUNITY HOSPITAL, PIL KANG, JOHN PAIVA, DAVIS RADIOLOGY, P.C., LEAH STEFFENSMEIER, THE WOMEN'S CENTER,** and **FORT MADISON PHYSICIANS AND SURGEONS,**

Appellees.

Appeal from the Iowa District Court for Lee (North) County, John M. Wright, Judge.

Parents of severely disabled child appeal summary judgment dismissing their wrongful-birth medical negligence action against physicians providing prenatal care. **DISTRICT COURT SUMMARY JUDGMENT REVERSED AND CASE REMANDED.**

Wayne M. Willoughby of Gershon, Willoughby, Getz & Smith, LLC, Baltimore, Maryland, Darwin Bünger of Crowley, Bünger & Prill, Burlington, for appellants.

Nancy J. Penner and Jennifer E. Rinden of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, for appellees Fort Madison Community Hospital, Leah Steffensmeier, The Women's Center, and Fort Madison Physicians and Surgeons.

Christine L. Conover and Carrie L. Thompson of Simmons, Perrine, Moyer, Bergman, PLC, Cedar Rapids, for appellees Pil Kang, John Paiva, and Davis Radiology, P.C.

**WATERMAN, Justice.**

This appeal presents a question of first impression under Iowa law: whether the parents of a child born with severe disabilities may bring a medical negligence action based on the physicians' failure to inform them of prenatal test results showing a congenital defect that would have led them to terminate the pregnancy. This is known as a wrongful-birth claim. Other jurisdictions are divided as to the parents' right to sue, with most states recognizing such claims. We previously held parents have no right to sue for wrongful pregnancy based on a medical mistake that led to the birth of a "normal, healthy child." *Nanke v. Napier*, 346 N.W.2d 520, 523 (Iowa 1984).

The parents in this Iowa action allege the prenatal doctors failed to inform them of abnormalities noted during an ultrasound. Their child was born with severe cognitive defects and remains unable to speak or walk at age five. The parents allege they would have chosen to terminate the pregnancy if they had been informed of what the ultrasound allegedly showed. They seek to recover for their ordinary and extraordinary costs of raising the child and for their loss of income and emotional distress. The district court granted the medical defendants' motion for summary judgment on the grounds that Iowa has not recognized "wrongful birth" as a cause of action.

For the reasons explained below, we join the majority of courts to allow parents to sue for the wrongful birth of a severely disabled child. This theory fits within general tort principles for medical negligence actions. We reverse the district court's summary judgment and remand the case to allow the parents' wrongful-birth claims to proceed consistent with this opinion.

## I. Background Facts and Proceedings.

The following facts are undisputed or set forth in the light most favorable to the plaintiffs. Pamela Plowman and Jeremy Plowman were married with two children, ages four and three, when Pamela became pregnant with their third child, Z.P., in late 2010. At the time, Pamela was employed at a retirement community working as a cook's assistant. On January 18, 2011, Pamela began seeing Leah Steffensmeier, a physician specializing in obstetrics and gynecology, for her prenatal care at the Fort Madison Community Hospital (FMCH).[1]

On April 25, approximately twenty-two weeks into her pregnancy, Pamela underwent an ultrasound at FMCH to assess fetal growth. Dr. Pil Kang, a radiologist employed by Davis Radiology, P.C., interpreted the results and prepared a report. Dr. John Paiva, another radiologist at that clinic, reviewed and signed the report. The report found that Z.P. displayed head abnormalities and recommended follow-up. Specifically, the report noted,

> 1) Suboptimal visualization of the head structure with cavum septum pellucidum not well seen. Recommend follow-up to document normal appearance.
>
> 2) Single, live intrauterine pregnancy consistent with 22 weeks 3 days by today's scan.
>
> 3) Slightly low head circumference to abnormal circumference ratio without definite etiology. Again, consider follow-up.

The films of the ultrasound showed Dr. Kang took three measurements of the head circumference. Each indicated Z.P.'s head was abnormally small, less than the third-to-sixth percentile for his development. Dr. Kang did not report these findings. Rather, he reported the

---

[1]Dr. Steffensmeier worked at Fort Madison Physicians and Surgeons and The Women's Center, located within FMCH.

head/abdominal circumference of Z.P. was "within two standard deviations of normal," with the head circumference/abdominal circumference ratio being "slightly" below normal. On May 11, Pamela met with Dr. Steffensmeier, who told her the ultrasound showed "[t]hat everything was fine" with the baby's development. Pamela was never informed "that the radiologist had found any abnormalities, or that the ultrasound was in any way abnormal." No further testing was done to follow up on the ultrasound results as recommended in the report.

On August 17, Pamela delivered Z.P., a baby boy. The delivery was uneventful. About two months after birth, Pamela began to have concerns about Z.P.'s development. She noticed he "had bicycle movements, smacking of the tongue. He'd stare off a lot, he'd stiffen up." At four months after birth, Z.P.'s pediatrician recommended Pamela see a specialist in Iowa City, Iowa, for Z.P.'s care. Pamela began taking Z.P. to Iowa City for testing and treatment. Z.P. was diagnosed with small corpus callosum, which plaintiffs contend relates to the head circumference as shown in the ultrasound. Z.P. suffers from cerebral palsy, microcephaly, intellectual disability, cortical visual impairment, and seizure disorder. He requires frequent visits to numerous doctors in Iowa City and Keokuk. Physical therapists come to his home one to two times weekly. He is on daily medication for seizures and reflux. Doctors have been unable to determine the exact cause of Z.P.'s disabilities. It is unlikely Z.P. will ever walk or speak.

On July 31, 2013, Pamela filed this lawsuit against FMCH, The Women's Center, Fort Madison Physicians and Surgeons, Davis Radiology, P.C., and doctors Kang, Paiva, and Steffensmeier. She does not claim the defendants caused Z.P.'s disabilities; rather, she alleges the doctors negligently failed to accurately interpret, diagnose, monitor,

respond to, and communicate the fetal abnormalities evident in the April 25, 2011 ultrasound. As a result of this negligent care, Pamela gave birth to Z.P., a child with severe brain abnormalities. If she had been informed of the abnormalities prior to birth, she "would have terminated her pregnancy." The petition sought damages for (1) the cost of past, present, and future extraordinary care required for Z.P. as a result of his disabilities; (2) the cost of ordinary care raising the child; (3) Pamela's mental anguish; and (4) Pamela's loss of income. Jeremy filed a separate action, mirroring Pamela's claims. No claim has been made on behalf of Z.P.; rather, the parents sue for their own individual injuries and costs attributable to Z.P.'s disabilities.

The defendants filed answers denying negligence and asserting the petitions failed to state a claim upon which relief could be granted. The radiologists also alleged plaintiffs could not prove causation because Z.P.'s injuries were caused by a preexisting medical condition. The district court consolidated the actions.

Meanwhile, Pamela and Jeremy divorced in September of 2013. Jeremy and Pamela share physical custody of their children, including Z.P. Pamela lives with her new fiancé in Keokuk, Iowa. Pamela quit working so she could attend Z.P.'s medical appointments. Z.P. does not walk or talk and is frequently sick; however, Pamela also noted that when he is not sick, he is "really happy" and "a good baby." Pamela testified she "really enjoy[s] spending time with [Z.P.] and get[s] a lot of happiness from him."

On September 11, the defendants filed a motion for summary judgment. The motion stated,

> Plaintiffs do not assert that Defendants' care and treatment caused [Z.P.'s] injuries. Instead, Plaintiffs allege that had "Mrs. Plowman [been] informed of her unborn child's

potential brain abnormality, Mrs. Plowman would have terminated her pregnancy and Plaintiff's injuries would have been avoided." This is a wrongful birth claim.

Defendants argued that a cause of action for wrongful birth had not been recognized in Iowa; therefore, plaintiffs' claims should be dismissed. Plaintiffs resisted the motion, arguing Iowa law did not preclude a wrongful-birth claim.

On May 27, 2015, the district court granted the defendants' motion for summary judgment. The court expressly declined to recognize a new cause of action for wrongful birth, stating a decision to do so was more properly left "to the legislature or the Supreme Court." Plaintiffs appealed, and we retained the case.

## II. Standard of Review.

"We review a district court ruling granting a motion for summary judgment for correction of errors at law." *Estate of Gray ex rel. Gray v. Baldi*, 880 N.W.2d 451, 455 (Iowa 2016) (quoting *Rathje v. Mercy Hosp.*, 745 N.W.2d 443, 447 (Iowa 2008)). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Barker v. Capotosto*, 875 N.W.2d 157, 161 (Iowa 2016) (quoting *Amish Connection, Inc. v. State Farm Fire & Cas. Co.*, 861 N.W.2d 230, 235 (Iowa 2015)). "Summary judgment is appropriate if the only conflict concerns the legal consequences of undisputed facts." *Peppmeier v. Murphy*, 708 N.W.2d 57, 58 (Iowa 2005) (quoting *Farmers Nat'l Bank of Winfield v. Winfield Implement Co.*, 702 N.W.2d 465, 466 (Iowa 2005)). "We . . . view the record in the light most favorable to the nonmoving party and will grant that party all reasonable inferences that can be drawn from the record." *Baldi*, 880 N.W.2d at 455 (quoting *Cawthorn v. Catholic Health Initiatives Iowa Corp.*, 806 N.W.2d 282, 286 (Iowa 2011)).

"The moving party has the burden of showing the nonexistence" of a genuine issue of material fact. *Nelson v. Lindaman*, 867 N.W.2d 1, 6 (Iowa 2015). "An issue of fact is 'material' only when the dispute involves facts which might affect the outcome of the suit, given the applicable governing law." *Id.* (quoting *Wallace v. Des Moines Indep. Cmty. Sch. Dist. Bd. of Dirs.*, 754 N.W.2d 854, 857 (Iowa 2008)). "An issue is 'genuine' if the evidence in the record 'is such that a reasonable jury could return a verdict for the non-moving party.' " *Id.* (quoting *Wallace*, 754 N.W.2d at 857). "Speculation is not sufficient to generate a genuine issue of fact." *Id.* (quoting *Hlubek v. Pelecky*, 701 N.W.2d 93, 96 (Iowa 2005)). We also note,

> Because resolution of issues of negligence and proximate cause turns on the reasonableness of the acts and conduct of the parties under all the facts and circumstances, actions for malpractice "are ordinarily not susceptible of summary adjudication."

*Campbell v. Delbridge*, 670 N.W.2d 108, 110 (Iowa 2003) (quoting *Oswald v. LeGrand*, 453 N.W.2d 634, 635 (Iowa 1990)).

**III. Analysis.**

The threshold question is whether Iowa law allows parents to sue for wrongful birth. Defendants allege that the claim is a new cause of action unsupported by Iowa law. Plaintiffs, on the other hand, allege that this case falls within the traditional elements of medical negligence and note a clear majority of other jurisdictions allow parents to sue under these facts. We conclude that wrongful birth fits within common law tort principles governing medical negligence claims, and no public policy or statute precludes the cause of action.

**A. Wrongful-Birth Jurisprudence.** We begin by defining terms. Courts categorize three distinct types of claims. *Nanke*, 346 N.W.2d at

521. "Wrongful pregnancy" is a medical negligence action "brought by the parents of a healthy, but unplanned, child against a physician who negligently performed a sterilization or abortion." *Id.* "Wrongful birth" is an action "brought by parents of a child born with birth defects." *Id.* "Wrongful life" is a claim "brought by the child suffering from such birth defects." *Id.* One court discussed use of the term "wrongful" as follows:

> These labels are not instructive. Any "wrongfulness" lies not in the life, the birth, the conception, or the pregnancy, but in the negligence of the physician. The harm, if any, is not the birth itself but the effect of the defendant's negligence on the parents' physical, emotional, and financial well-being resulting from the denial to the parents of their right, as the case may be, to decide whether to bear a child or whether to bear a child with a genetic or other defect.

*Viccaro v. Milunsky*, 551 N.E.2d 8, 9 n.3 (Mass. 1990); *see also* Wendy F. Hensel, *The Disabling Impact of Wrongful Birth and Wrongful Life Actions*, 40 Harv. C.R.-C.L. L. Rev. 141, 164–67 (2005) (contrasting wrongful-birth and wrongful-life actions); Mark Strasser, *Yes, Virginia, There Can Be Wrongful Life: On Consistency, Public Policy, and the Birth-Related Torts*, 4 Geo. J. Gender & L. 821, 824–28 (differentiating wrongful-pregnancy and wrongful-birth claims) [hereinafter Strasser].

In *Nanke*, we addressed whether parents could recover for wrongful pregnancy in Iowa after a failed abortion procedure led to the birth of a healthy child. 346 N.W.2d at 521 ("[T]he factual situation involved in this case would more accurately be depicted as a claim for 'wrongful pregnancy.'"). We held the parents could not recover, noting "a parent cannot be said to have been damaged or injured by the birth and rearing of a normal, healthy child because the invaluable benefits of parenthood outweigh the mere monetary burdens as a matter of law." *Id.* at 522–23. *Nanke* is distinguishable, as we expressly limited its holding to deny recovery for the costs of raising a "normal, healthy" child:

> Our ruling today is limited to the unique facts of this case and the narrow issue presented. We hold only that the parent of a *normal, healthy* child may not maintain an action to recover the expenses of rearing that child from a physician whose alleged negligence in performing a therapeutic abortion permitted the birth of such child.

*Id.* at 523 (emphasis added). We now address the separate question of whether parents of a child born with severe disabilities can sue for wrongful birth.

In a wrongful-birth action, parents of a child born with a detectable birth defect allege that they would have avoided conception or terminated the pregnancy but for the physician's negligent failure to inform them of the likelihood of the birth defect. *Keel v. Banach*, 624 So. 2d 1022, 1024 (Ala. 1993). The injury to the parents results from the loss of the opportunity to make an informed decision about whether to avoid or terminate the pregnancy. *Garrison v. Med. Ctr. of Del., Inc.*, 581 A.2d 288, 290 (Del. 1989).

A majority of states recognize wrongful-birth claims. At least twenty-three states recognize the claim by judicial decision.[2] Maine

---

[2]*See, e.g.*, *Keel*, 624 So. 2d at 1029; *Turpin v. Sortini*, 643 P.2d 954, 965 (Cal. 1982) (en banc); *Lininger ex rel. Lininger v. Eisenbaum*, 764 P.2d 1202, 1208 (Colo. 1988) (en banc); *Rich v. Foye*, 976 A.2d 819, 824 (Conn. Super. Ct. 2007); *Garrison*, 581 A.2d at 291; *Haymon v. Wilkerson*, 535 A.2d 880, 884–85 (D.C. 1987); *Kush v. Lloyd*, 616 So. 2d 415, 423–24 (Fla. 1992) (per curiam); *Clark v. Children's Mem'l Hosp.*, 955 N.E.2d 1065, 1072 (Ill. 2011); *Siemieniec v. Lutheran Gen. Hosp.*, 512 N.E.2d 691, 705–06 (Ill. 1987), *overruled in part by Clark*, 955 N.E.2d at 1087; *Bader v. Johnson*, 732 N.E.2d 1212, 1220 (Ind. 2000); *Pitre v. Opelousas Gen. Hosp.*, 530 So. 2d 1151, 1163 (La. 1988); *Reed v. Campagnolo*, 630 A.2d 1145, 1152 (Md. 1993); *Viccaro*, 551 N.E.2d at 11; *Greco v. United States*, 893 P.2d 345, 348 (Nev. 1995); *Smith v. Cote*, 513 A.2d 341, 348 (N.H. 1986); *Schroeder v. Perkel*, 432 A.2d 834, 840 (N.J. 1981); *Becker v. Schwartz*, 386 N.E.2d 807, 813 (N.Y. 1978); *Tomlinson v. Metro. Pediatrics, LLC*, 366 P.3d 370, 386 (Or. Ct. App. 2015), *review granted*, 2016 WL 6693689 (June 30, 2016); *Owens v. Foote*, 773 S.W.2d 911, 913 (Tenn. 1989); *Jacobs v. Theimer*, 519 S.W.2d 846, 849 (Tex. 1975); *Naccash v. Burger*, 290 S.E.2d 825, 830 (Va. 1982); *Harbeson v. Parke-Davis, Inc.*, 656 P.2d 483, 488 (Wash. 1983) (en banc); *James G. v. Caserta*, 332 S.E.2d 872, 882 (W. Va. 1985); *Dumer v. St. Michael's Hosp.*, 233 N.W.2d 372, 377 (Wis. 1975); *see also Phillips v. United States*, 508 F. Supp. 544, 551 (D.S.C. 1981) (stating South Carolina would recognize the action).

allows wrongful-birth claims by statute.[3]  A minority of jurisdictions decline to do so.  Three state supreme courts have refused to allow wrongful-birth claims.[4]  Twelve states have enacted legislation barring wrongful-birth claims.[5]  Three of those states had allowed wrongful-birth claims by judicial decision before the legislature barred them.[6]

"Two developments help explain the trend toward judicial acceptance of wrongful birth actions." *Smith v. Cote,* 513 A.2d 341, 345 (N.H. 1986).  First, advancements in prenatal care have resulted in an "increased ability of health care professionals to predict and detect the presence of fetal defects." *Id.*  This raises the importance of genetic counseling for expecting parents.  *Id.*  Indeed, prenatal testing is "extremely prevalent and is widely accepted," and "will likely become more common in the future."  Cailin Harris, *Statutory Prohibitions on Wrongful Birth Claims & Their Dangerous Effects on Parents*, 34 B.C. J.L.

---

[3]Me. Rev. Stat. Ann. tit. 24, § 2931 (West, Westlaw current through ch. 1 of the 2017 Reg. Sess.).

[4]*See, e.g.*, *Atlanta Obstetrics & Gynecology Grp. v. Abelson*, 398 S.E.2d 557, 563 (Ga. 1990); *Grubbs ex rel. Grubbs v. Barbourville Family Health Ctr.*, 120 S.W.3d 682, 689 (Ky. 2003); *Azzolino v. Dingfelder*, 337 S.E.2d 528, 537 (N.C. 1985).

[5]*See* Ariz. Rev. Stat. Ann. § 12-719 (Westlaw current through 2016 legislation); Idaho Code Ann. § 5-334 (West, Westlaw current through ch. 37 of 2017 1st Reg. Sess.); Kan. Stat. Ann. § 60-1906 (West, Westlaw current through laws enacted as of Jan. 18, 2017); Mich. Comp. Laws Ann. § 600.2971 (West, Westlaw current through No. 563 of 2016 Reg. Sess.); Minn. Stat. Ann. § 145.424 (West, Westlaw current through ch. 5 2017 Reg. Sess.); Mo. Ann. Stat. § 188.130 (West, Westlaw current through 2016 Reg. Sess.); Mont. Code Ann. § 27-1-747 (West, Westlaw current through Feb. 20, 2017); Ohio Rev. Code Ann. § 2305.116 (West, Westlaw through 2016 Reg. Sess.); Okla. Stat. Ann. tit. 63, § 1-741.12 (West, Westlaw current through 2016 2d Sess.); 42 Pa. Stat. & Cons. Stat. Ann. § 8305 (West, Westlaw current through 2016 Reg. Sess.); S.D. Codified Laws § 21-55-2 (Westlaw current through Feb. 23, 2017); Utah Code Ann. § 78B-3-109 (West, Westlaw current through 2016 4th Special Sess.).

[6]*See Blake v. Cruz*, 698 P.2d 315, 320–21 (Idaho 1984), *superseded by statute*, Idaho Code Ann. § 5-334; *Arche v. United States*, 798 P.2d 477, 480 (Kan. 1990), *superseded by statute*, Kan. Stat. Ann. § 60-1906; *Speck v. Finegold*, 439 A.2d 110, 113–15 (Pa. 1981), *superseded by statute*, 42 Pa. Stat. & Cons. Stat. Ann. § 8305.

& Soc. Just. 365, 370 (2014) (recognizing that the American Congress of Obstetricians and Gynecologists recommends doctors test all pregnant women for genetic abnormalities) [hereinafter Harris].

Second, *Roe v. Wade* and its progeny established as a matter of federal constitutional law that a woman has a right to choose whether to terminate her pregnancy free from state interference before the fetus is viable. 410 U.S. 113, 153, 93 S. Ct. 705, 727 (1973) ("This right of privacy . . . is broad enough to encompass a woman's decision whether or not to terminate her pregnancy."); *Whole Woman's Health v. Hellerstedt*, 579 U.S. ___, ___, 136 S. Ct. 2292, 2318 (2016) (striking down Texas laws regulating abortion clinics that imposed undue burdens on the women's right to choose to terminate pregnancy). As a result, today

> it is possible for prospective parents (1) to know, well in advance of birth, of the risk or presence of congenital defects in the fetus they have conceived; and (2) to decide to terminate the pregnancy on the basis of this knowledge.

*Cote*, 513 A.2d at 346. Accordingly, courts have held physicians who perform prenatal care and testing "have an obligation to adhere to reasonable standards of professional performance." *Id.*

**B. Wrongful Birth as a Cognizable Claim Under Iowa Law.** Against this backdrop, we turn to whether Iowa law allows a cause of action for wrongful birth. In *Dier v. Peters*, we addressed whether Iowa tort law allows a cause of action for paternity fraud. 815 N.W.2d 1, 4 (Iowa 2012). We considered three factors to decide whether to recognize the right to sue: (1) whether the action is consistent with traditional concepts of common law, (2) whether there are prevailing policy reasons against recognizing such a cause of action, and (3) whether Iowa statutes speak to the issue. *Id.* at 3. Because paternity fraud fit within

traditional notions of common law fraud and was not "contrary to a law or policy expressed by the general assembly," we determined the father could maintain the claim. *Id.* at 13–14. We use the *Dier* three-factor test to decide whether to recognize a wrongful-birth claim.

1. *Whether a wrongful-birth claim is consistent with traditional concepts of common law.* From our vantage point, a wrongful-birth claim "fit[s] comfortably within the traditional boundaries of [negligence] law." *See id.* at 7. We join the majority of other jurisdictions in concluding wrongful-birth claims fall within existing medical negligence principles. *See, e.g., Lininger ex rel. Lininger v. Eisenbaum*, 764 P.2d 1202, 1205 (Colo. 1988) (en banc) ("Although courts and commentators often speak of wrongful life and wrongful birth as torts in themselves, it is more accurate to view these terms as describing the result of a physician's negligence."); *Becker v. Schwartz*, 386 N.E.2d 807, 811 (N.Y. 1978) ("Irrespective of the label coined, plaintiffs' complaints sound essentially in negligence or medical malpractice."); *Owens v. Foote*, 773 S.W.2d 911, 913 (Tenn. 1989) ("[M]edical malpractice suits of this nature, brought by parents, alleging birth defects of an infant, are not unknown in this State and we see no reason to endeavor to fit them into some specific category beyond a suit for ordinary negligence."); *Naccash v. Burger*, 290 S.E.2d 825, 829 (Va. 1982) ("Whether a cause of action exists for the wrongs complained of and the damages sought . . . should be determined . . . according to traditional tort principles.").

The traditional elements of a medical negligence action are (1) an applicable standard of care, (2) a violation of this standard, and (3) a causal relationship between the violation and injury sustained. *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 718 (Iowa 2001). "A physician owes a duty to his patient to exercise the ordinary knowledge and skill of his

or her profession in a reasonable and careful manner when undertaking the care and treatment of a patient." *J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 260 (Iowa 1999). This duty is based on privity, arising from the contractual relationship between the two. *Id.* Although this contractual physician–patient relationship is sufficient to establish a duty, it is not required. *Id.* To establish a deviation from the standard of care, plaintiffs need to prove that a reasonably competent physician would have observed the abnormalities from the ultrasound or other procedure and reported the results to the parents. "Ordinarily, evidence of the applicable standard of care—and its breach—must be furnished by an expert." *Oswald*, 453 N.W.2d at 635. As to causation, plaintiffs must prove if the procedure had not been performed negligently or delayed and the parents had been timely informed of the impairment, they would have chosen to terminate the pregnancy. Finally, the resulting injury to the parents "lies in their being deprived of the opportunity to make an informed decision to terminate the pregnancy, requiring them to incur extraordinary expenses in the care and education of their child afflicted with a genetic abnormality." *Garrison*, 581 A.2d at 290.

Courts declining to allow wrongful-birth claims have questioned the elements of causation and injury. One judge who dissented from a decision allowing a wrongful-birth claim concluded the physician "cannot be said to have caused" the child's genetic abnormality:

> The disorder is genetic and not the result of any injury negligently inflicted by the doctor. In addition it is incurable and was incurable from the moment of conception. Thus the doctor's alleged negligent failure to detect it during prenatal examination cannot be considered a cause of the condition by analogy to those cases in which the doctor has failed to make a timely diagnosis . . . .

*Becker*, 386 N.E.2d at 816 (Wachtler, J., dissenting in part). By contrast, in traditional medical negligence actions seeking recovery for a child's disabling injuries, the disability was allegedly inflicted by the defendant doctor. *See, e.g.*, *Asher v. OB-Gyn Specialists, P.C.*, 846 N.W.2d 492, 494–95, 503 (Iowa 2014) (affirming jury verdict awarding damages to parents for their baby's brachial plexis injury and broken clavicle caused by physician's negligence during delivery), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016); *Kilker ex rel. Kilker v. Mulry*, 437 N.W.2d 1, 2 (Iowa Ct. App. 1988) (reviewing appeal in case alleging child's brain injury was caused by doctor's negligence).

Yet we have previously allowed patients to sue for a physician's negligent failure to *diagnose* health problems the physician did not cause. In *DeBurkarte v. Louvar*, a physician failed to timely diagnose breast cancer. 393 N.W.2d 131, 133 (Iowa 1986). The defendant argued there was insufficient evidence to hold that "his failure to properly diagnose the cancer probably caused [the plaintiff's] injuries." *Id.* at 134. Although it was undisputed that the physician did not "cause" the plaintiff's cancer, we allowed recovery for the plaintiff's lost chance of survival. *Id.* at 137. We reasoned that the physician's negligent failure to diagnose, in combination with the preexisting condition, increased the risk of harm to the plaintiff who otherwise could have obtained timely treatment. *See id.* at 135. Any other rule would "subvert[] the deter[r]ence objectives of tort law by denying recovery for the effects of conduct that causes statistically demonstrable losses." *Id.* at 137 (quoting Joseph H. King Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L.J. 1353, 1377 (1981)).

Causation "take[s] on a markedly more complex character . . . in those cases in which alleged negligence combines with a preexisting condition to cause the ultimate harm to the plaintiff." *Mead v. Adrian*, 670 N.W.2d 174, 182 (Iowa 2003) (Cady, J., concurring specially); *see also Greco v. United States*, 893 P.2d 345, 349 (Nev. 1995) ("Even though the physician did not *cause* the cancer, the physician can be held liable for damages resulting from the patient's decreased opportunity to fight the cancer, and for the more extensive pain, suffering and medical treatment the patient must undergo by reason of the negligent diagnosis."). Here, it is undisputed the physicians did not cause Z.P.'s birth defects. But the parents testified they would have terminated the pregnancy, and thereby avoided the costs of Z.P.'s disability, had the physicians informed them of the ultrasound results.

Courts disallowing wrongful-birth claims reject the view "that the existence of a human life can constitute an injury cognizable at law." *Azzolino v. Dingfelder*, 337 S.E.2d 528, 533–34 (N.C. 1985) ("[W]e are unwilling to say that life, even life with severe defects, may ever amount to a legal injury."). We said as much in *Nanke* as to a healthy child. 346 N.W.2d at 523 ("That a child can be considered an injury offends fundamental values attached to human life." (quoting *Cockrum v. Baumgartner*, 447 N.E.2d 385, 388–89 (Ill. 1983))). However, under the wrongful-birth theory, the relevant injury is not the resulting life, but the negligent deprivation of information important to the parents' choice whether to terminate a pregnancy. Courts disallowing wrongful-birth claims "conflate[] the claimants' injury allegation with their ultimate claim for damages." *Grubbs ex rel. Grubbs v. Barbourville Family Health Ctr., P.S.C.*, 120 S.W.3d 682, 694–95 (Ky. 2003) (Keller, J., concurring in

part and dissenting in part). A dissenting justice saw this "analytical flaw" in the majority's rejection of a wrongful-birth theory:

> [W]hile both the majority and concurring opinions attempt to frame the relevant issue . . . as whether [the child's] *life* can constitute a legal injury in the context of a prima facie case for medical malpractice, "we need not find that 'life, even life with severe defects,' constitutes a legal injury in order to recognize the . . . claim for relief" because "[t]he resulting injury to the plaintiff parents lies in their being deprived of the opportunity to make an informed decision to terminate the pregnancy[.]" . . . [A]lthough one facet of a plaintiff's compensable *damages* in such cases may consist of extraordinary costs associated with the care and education of a child with birth-defect-related disabilities, those damages are available only because they are the result of a physician's violation of the patient's right to make an informed procreative decision[.]

*Id.* at 695 (some alterations in original) (footnote omitted) (first quoting *Lininger*, 764 P.2d at 1206; and then quoting *Garrison*, 581 A.2d at 290).

The compensable injury in a wrongful-birth claim is the parents' loss of the opportunity to make an informed decision to terminate the pregnancy. This is analogous to a claim for medical negligence based on lack of informed consent. Both types of claims arise out of "the unquestioned principle that absent extenuating circumstances a patient has the right to exercise control over his or her body by making an informed decision." *Pauscher v. Iowa Methodist Med. Ctr.*, 408 N.W.2d 355, 358 (Iowa 1987). "The patient's right to make an intelligent and informed decision cannot be exercised when information material to that decision is withheld." *Id.* at 359–60. To make an informed decision regarding continuation of a pregnancy, "the patient has the right to expect the information reasonably necessary to that process will be made available by the physician." *Id.* at 360.

We are persuaded by the New Jersey Supreme Court's analysis comparing informed-consent and wrongful-birth actions:

In sum, the informed consent and wrongful birth causes of action are similar in that both require the physician to disclose those medically accepted risks that a reasonably prudent patient in the plaintiff's position would deem material to her decision. What is or is not a medically accepted risk is informed by what the physician knows or ought to know of the patient's history and condition. . . . In both causes of action, the plaintiff must prove not only that a reasonably prudent patient in her position, if apprised of all material risks, would have elected a different course of treatment or care. . . . [T]he test of proximate causation is satisfied by showing that an undisclosed fetal risk was material to a woman in her position; the risk materialized, was reasonably foreseeable and not remote in relation to the doctor's negligence; and, had plaintiff known of that risk, she would have terminated her pregnancy.

*Canesi ex rel. Canesi v. Wilson*, 730 A.2d 805, 813 (N.J. 1999); *see also Bader v. Johnson*, 732 N.E.2d 1212, 1217 (Ind. 2000) (stating physician providing prenatal care has a duty to disclose "material facts relevant to the patient's decision about treatment," and while "discussion of this duty has generally arisen in cases involving informed consent and the doctrine of fraudulent concealment . . . , the underlying premise is still the same" (footnotes omitted)); *Reed v. Campagnolo*, 630 A.2d 1145, 1149 (Md. 1993) (concluding that wrongful-birth cases "present a form of proximate cause reasoning that is analogous to that applied in informed consent cases").

"[A]n action in tort for a negligently performed or delayed medical diagnostic procedure lies within the common law of negligence . . . ." *Garrison*, 581 A.2d at 291. We decline to "compound[] or complicat[e] our medical malpractice jurisprudence by according this particular form of professional negligence action some special status apart from presently recognized medical malpractice." *Greco*, 893 P.2d at 348. Without altering traditional rules of negligence, we acknowledge "a newly recognized compensable event to which those traditional rules apply." *Mead*, 670 N.W.2d at 178 (applying loss-of-chance doctrine to traditional

principles of proximate cause). The parents have alleged "a well-recognized civil wrong without contorting any of the elements to conform to [the] facts." *Dier*, 815 N.W.2d at 11 (allowing paternity-fraud claim to proceed because it met traditional elements of a fraud claim despite presenting an atypical fact pattern). We conclude that a claim for wrongful birth is consistent with traditional common law principles of medical negligence, and we move on to the second *Dier* factor.

2. *Whether there are prevailing policy reasons against recognizing such a cause of action.* Defendants contend that recognition of a wrongful-birth action would contravene Iowa public policy. Public policy "is not predicated on this court's 'generalized concepts of fairness and justice.'" *Id.* at 12 (quoting *Claude v. Guar. Nat'l Ins. Co.*, 679 N.W.2d 659, 663 (Iowa 2004)).

> Rather, "[w]e must look to the Constitution, statutes, and judicial decisions of [this] state, to determine [our] public policy and that which is not prohibited by statute, condemned by judicial decision, nor contrary to the public morals contravenes no principle of public policy."

*Id.* (alterations in original) (quoting *Claude*, 679 N.W.2d at 663).

In *Nanke*, we confronted whether the parents of a "normal, healthy child" could recover for costs associated with raising the child after a negligently performed abortion. 346 N.W.2d at 522–23. We concluded they could not because "the invaluable benefits of parenthood outweigh the mere monetary burdens as a matter of law." *Id.* at 523. We stated,

> The bond of affection between a child and parent, the pride in the child's achievement, and the comfort, counsel and society of a child are incalculable benefits, which should not be measured by some misplaced attempt to put a specific dollar value on a child's life.

*Id.* (quoting *Beardsley v. Wierdsma*, 650 P.2d 288, 293 (Wyo. 1982)). We also highlighted the "awkwardness that would inevitably surface under

the application of the Restatement (Second) § 920 'benefits' approach," which offsets damages incurred by a benefit obtained. *Id.* We noted parents would have to show that they did not want the child and the child was of minimal value to them to minimize the offset. *Id.* We refused to sanction this type of argument. *Id.*

The defendants contend the same reasoning applies here. They argue a contrary holding would stigmatize the disabled community, encourage abortions, increase the cost of prenatal care, and result in fraudulent claims. We are not persuaded those concerns warrant closing the courthouse door to parents harmed by medical negligence.

First, we distinguish the policy concerns expressed in *Nanke*. In a wrongful-birth claim, the injury is not the resulting life of a healthy child as in *Nanke*, but rather is the parent's deprivation of information material to making an informed decision whether to terminate a pregnancy of a child likely to be born with severe disabilities. Our informed-consent caselaw rests on the patient's right to exercise control in making personal medical decisions. *See Pauscher*, 408 N.W.2d at 358. Iowa Code section 147.137 (2017) codifies a presumption of informed consent when a patient receives in writing the risks "of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, or disfiguring scars associated with such procedure." In *Pauscher*, we relied on this statute in recognizing a legislative public policy favoring informed consent. 408 N.W.2d at 361.

The legislature also has made a policy choice to help ensure a woman makes an informed decision whether to terminate or continue her pregnancy. Iowa Code section 146A.1(2) states that as a prerequisite to an abortion, a woman must be "provided information regarding the options relative to a pregnancy, including continuing the pregnancy to

term and retaining parental rights following the child's birth, continuing the pregnancy to term and placing the child up for adoption, *and terminating the pregnancy.*" (Emphasis added.);[7] *see also id.* § 135L.2 (establishing program for minors seeking an abortion to receive information on decision whether to continue or terminate the pregnancy). To make an informed decision whether to proceed with the pregnancy, the woman must be informed of all material facts, including the likelihood the child will be born with a severe birth defect.

*Nanke* relied in part on an offset rule. 346 N.W.2d at 523. Under the Restatement (Second) of Torts,

> [w]hen the defendant's tortious conduct has caused harm to the plaintiff . . . and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages . . . .

Restatement (Second) of Torts § 920, at 509 (Am. Law Inst. 1979).[8] We noted in *Nanke* that a strict application of this rule to the ordinary costs of raising a normal, healthy child would require the parent to prove the child was of minimal value to them. 346 N.W.2d at 523. In contrast, the *Lininger* court pointed out that in wrongful-birth cases involving a severely disabled child,

> the extraordinary financial burden the [Plaintiffs] claim to have suffered, and will continue to suffer, is sufficiently

---

[7]Section 146A.1(1) also states that a woman must be given the opportunity to view an ultrasound of the fetus "as part of the standard of care." The Iowa legislature recently revised Iowa Code section 146A.1 to provide that "[a] physician performing an abortion shall obtain written certification from the pregnant woman of all of the following at least seventy-two hours prior to performing an abortion:" an ultrasound viewing, description of the unborn child, hearing the heartbeat of the unborn child, and relevant information regarding pregnancy, adoption, and termination. S.F. 471, 87th G.A., 1st Sess. § 1 (Iowa 2017).

[8]We find no such provision in the Restatement (Third) of Torts: Liability for Physical & Emotional Harm (Am. Law Inst. 2010 & 2012).

unrelated to the pleasure they will derive from raising [the disabled child] as to preclude operation of the benefit rule, at least to the extent that it would require some offset against those particular damages.

764 P.2d at 1207. Imagine the case of a woman carrying a healthy fetus injured during the delivery because of a failure to diagnose a birthing issue, such as an umbilical cord wrapped around the neck. In that circumstance,

> we would have no problem assessing damages. More importantly we would not even consider the theory that the joy of parenthood should offset the damages. Would anyone in their right mind suggest that where a healthy fetus is injured during delivery the joy of parenthood should offset the damages? There is no more joy in an abnormal fetus come to full term than a normal fetus permanently injured at delivery. Both are heartbreaking conditions that demand far more psychological and financial resources than those blessed with normal children can imagine.

*Atlanta Obstetrics & Gynecology Grp. v. Abelson*, 398 S.E.2d 557, 565 (Ga. 1990) (Smith, P.J., dissenting). Pamela testified she "really enjoy[s] spending time with [Z.P.] and get[s] a lot of happiness from him." But "that pleasure will be derived in spite of, rather than because of, [the child's] affliction." *Schroeder v. Perkel*, 432 A.2d 834, 842 (N.J. 1981). We decline to monetize the joy of raising a severely disabled child to offset the costs of raising him.[9]

---

[9]Other courts have reached the same conclusion that the concerns raised in *Nanke* do not preclude recovery for extraordinary costs of raising a disabled child. *See* Strasser, 4 Geo. J. Gender & L. at 832 (collecting cases declining to award damages for raising a healthy child, but allowing wrongful-birth claims for extraordinary costs). For example, the *Haymon* court disallowed an action for wrongful pregnancy but allowed an action for wrongful birth. 535 A.2d at 884 (noting the rationale of a decision denying a wrongful-pregnancy claim was "misplaced in the context of [a] wrongful birth case" because "the claimed injury and the economic relief sought . . . are completely distinct"). In a wrongful-birth claim, parents seek extraordinary medical expenses due to their deprivation "of their right to make an informed decision whether to carry their child to term." *Id.* By contrast, in wrongful-pregnancy and wrongful-life cases, "the injury was life itself." *Bader*, 732 N.E.2d at 1219 (disallowing wrongful-life claim but allowing wrongful-birth claim). The law is not equipped to weigh the value of life versus

Defendants argue that allowing wrongful-birth claims will stigmatize the disabled community. That concern does not warrant closing the courthouse door to these parents. "We fail to see how the parents' recovery of extraordinary medical and educational expenses, so as to minimize the detrimental effect of the child's impairment, is outweighed by any speculation about stigma that he might suffer." *Lininger*, 764 P.2d at 1207; *see also Turpin v. Sortini*, 643 P.2d 954, 961–62 (Cal. 1982) (en banc) ("[I]t is hard to see how an award of damages to a severely handicapped or suffering child would 'disavow' the value of life or in any way suggest that the child is not entitled to the full measure of legal and nonlegal rights and privileges accorded to all members of society."). Parents make "the difficult decision to sue for wrongful birth because they want[] to recover costs in order to ensure that their [child] would have the best possible medical care." Harris, 34 B.C. J.L. & Soc. Just. at 395. For example, damages from a wrongful-birth claim were used by one family to "pay for some of the expenses of raising their [child], including prostheses, wheelchairs, operations, attendants, and other healthcare needs." *Id.* Defendants argue the disabled child may later be emotionally traumatized upon learning his or her parents would have chosen to abort. But given Z.P.'s severe cognitive disabilities, there is nothing in the record to indicate he will someday understand his parents sued over their lost opportunity to avoid his birth.

Defendants also contend that allowing a right to sue for wrongful birth will increase the cost of prenatal care by encouraging physicians to practice "defensive medicine" and that increased disclosure of risks will

_____

nonlife, but with appropriate expert testimony juries are capable of calculating the extraordinary costs of raising a severely disabled child. *See id.*

lead to more abortions. We disagree that these concerns justify closing the courthouse door.

> A physician need not, indeed should not, advise a patient on whether to abort a child. A physician's responsibility is simply to exercise due care to provide the information necessary for the *patient* to make an informed decision. If physicians do this, they need not fear a lawsuit if parents bear a child of one sex rather than the other, or even a child with congenital defects. The physician will not be liable for the patient's informed decision on the abortion question. To deny . . . any remedy for a physician's negligently withholding information or negligently providing misinformation so immunizes the physician as to encourage the physician himself, in effect, to make the abortion decision.

*Azzolino*, 337 S.E.2d at 538 (Exum, J., dissenting). There are limitations on a physician's liability for a failure to disclose, or a negligent disclosure, already inherent in the common law negligence standard. As in informed-consent cases, a physician will only be liable when he or she has failed to disclose a *material* fact relevant to the decision to continue or terminate the pregnancy. *See Pauscher*, 408 N.W.2d at 361–62 ("Materiality may be said to be the significance a reasonable person, in what the physician knows or should know is his [or her] patient's position, would attach to the disclosed risk or risks in deciding whether to submit . . . to surgery or treatment." (alteration in original) (quoting *Wilkinson v. Vesey*, 295 A.2d 676, 689 (R.I. 1972))). The applicable standard of care represents another limitation: a physician will only be liable for failure to discover a risk if a physician of reasonable care and skill in good standing under like circumstances would have discovered it. *See Bray v. Hill*, 517 N.W.2d 223, 226 (Iowa Ct. App. 1994) (discussing applicable standard).

Finally, defendants argue that recognition of wrongful-birth claims will lead to fraudulent claims. The Missouri Supreme Court declined to

allow lawsuits for wrongful birth, noting that "[i]n the wrongful birth action, the right to recovery is based solely on the woman testifying, long after the fact and when it is in her financial interest to do so, that she would have chosen to abort if the physician had but told her" of the risk of genetic abnormality. *Wilson v. Kuenzi*, 751 S.W.2d 741, 745–46 (Mo. 1988) (en banc). Although proof of causation will depend on a "counterfactual," or what the plaintiffs *would have done* if they had been properly informed by their physicians, this is the standard of proof in every informed-consent case. *Cote*, 513 A.2d at 347; *see also Pauscher*, 408 N.W.2d at 360 (stating one element of informed consent is proof that "[d]isclosure of the risk would have led a reasonable patient in plaintiff's position to reject the medical procedure or choose a different course of treatment"). We favor placing trust in Iowa juries and our adversary system to root out fraudulent claims, rather than the alternative of closing the courthouse door to victimized parents with legitimate claims.

We must consider "the public policy implications of an opposite ruling." *Dier*, 815 N.W.2d at 12. Declining to recognize a claim for wrongful birth would "immunize those in the medical field from liability for their performance in one particular area of medical malpractice," namely, prenatal care and genetic counseling. *Bader*, 732 N.E.2d at 1219–20 (quoting *Garrison v. Foy*, 486 N.E.2d 5, 8 (Ind. Ct. App. 1985)). The defendants in this case have identified no other common law decision apart from *Nanke* in which we immunize physicians from liability for their negligence, and we decline to do so here.[10] Conversely,

---

[10]The legislature has enacted certain statutory immunities for physicians that further other public policy goals, such as encouraging the reporting and investigation of child abuse complaints. *See, e.g., Nelson*, 867 N.W.2d at 9 ("We therefore construe the immunity provision in [Iowa Code] section 232.73 liberally to encourage communications between physicians and DHS child abuse investigators.").

recognition of wrongful-birth actions will encourage more accurate prenatal testing. *See Phillips v. United States*, 508 F. Supp. 544, 551 (D.S.C. 1981). Allowing recovery is also consistent with a goal of tort law—to compensate an injured party with damages in order to attempt to make them whole. *See Wilson v. IBP, Inc.*, 589 N.W.2d 729, 732 (Iowa 1999). On balance, we conclude public policy favors allowing wrongful-birth actions. If the legislature disagrees with our decision, it is free to enact a statute precluding wrongful-birth claims. No such statute is currently on the books.

3. *Whether Iowa statutes speak to the issue.* Turning to the last *Dier* factor, defendants argue Iowa should not recognize a wrongful-birth claim because Iowa Code section 613.15A and Iowa Rule of Civil Procedure 1.206 limit parents' ability to recover medical expenses for a child's injuries. Iowa Code section 613.15A provides,

> A parent or the parents of a child may recover for the expense and actual loss of services, companionship, and society resulting from injury to or death of a minor child and may recover for the expense and actual loss of services, companionship, and society resulting from the death of an adult child.

Iowa Rule of Civil Procedure 1.206 states, "A parent or the parents, may sue for the expense and actual loss of services, companionship and society resulting from injury to or death of a minor child."

Both Iowa Code section 613.15A and rule 1.206 by their plain language apply to parents seeking to recover expenses resulting from the "*injury . . .* of a minor child." (Emphasis added.) To pursue a claim under those provisions, a parent must establish that the child's injury was wrongfully or negligently caused. "Actions brought under rule [1.206] are not for the injury to the child but for the injury to the [parent] *as a consequence of the injury to the child.*" *Wardlow v. City of Keokuk,*

190 N.W.2d 439, 443 (Iowa 1971) (emphasis added); *accord Jones v. State Farm Mut. Auto. Ins. Co.*, 760 N.W.2d 186, 188 (Iowa 2008). "[T]he gist of a rule [1.206] action is 'a wrong done to the parent *in consequence of injury to his child* by the actionable negligence of another.'" *Dunn v. Rose Way, Inc.*, 333 N.W.2d 830, 832 (Iowa 1983) (emphasis added) (quoting *Handeland v. Brown*, 216 N.W.2d 574, 578 (Iowa 1974)).

Here, as the defendants note, "there is no allegation that Defendants negligently caused [Z.P.'s] injuries." There is no injury to the child; rather, the injury is to the *parent*s—specifically their right to make an informed choice whether to continue or end a pregnancy. Rule 1.206 and section 613.15A do not govern a wrongful-birth claim. We conclude the Iowa legislature has not statutorily barred wrongful-birth claims.

The Iowa legislature, however, has by statute expressed its policy preference for medical informed-consent procedures and accurately informing a woman regarding her options for continuing or terminating a pregnancy. *See* Iowa Code § 146A.1; *id.* § 147.137. Allowing a cause of action here furthers this legislative purpose without contravening section 613.15A or rule 1.206. Thus, we conclude that an action for wrongful-birth is cognizable under Iowa law.

The parents must prove the defendant's negligence deprived them of the opportunity to *lawfully* terminate the pregnancy in Iowa. *See id.* § 707.7 (generally prohibiting abortions after the second trimester of the pregnancy with exceptions to preserve life or health of the mother);[11]

---

[11]Section 707.7 provides in relevant part,

    1. Any person who intentionally terminates a human pregnancy, with the knowledge and voluntary consent of the pregnant person, after the end of the second trimester of the pregnancy where death of the fetus results commits feticide. Feticide is a class "C" felony.

    . . . .

*OB/GYN Specialists of Palm Beaches, P.A. v. Mejia*, 134 So. 3d 1084, 1087–88, 1091 (Fla. Dist. Ct. App. 2014) (requiring plaintiff in wrongful-birth claim to prove she was deprived of the opportunity to lawfully obtain an abortion within the time permitted under the forum state's law, regardless of the plaintiff's ability to obtain a lawful late-term abortion in another state). We conclude Iowa public policy would not permit recovery for wrongful birth if the abortion in question would be illegal.[12] To the contrary, the public policy codified in section 707.7 precludes such a recovery. The Plowmans's claims arise from the allegedly misinterpreted ultrasound during the second trimester of Pamela's pregnancy with Z.P.

The right to sue for wrongful birth belongs to parents who were denied the opportunity to make an *informed* choice whether to lawfully terminate a pregnancy in Iowa. It is not this court's role to second-guess that intensely personal and difficult decision. Parents of children with disabilities may find their lives enriched by the challenges and joys they

---

4. This section shall not apply to the termination of a human pregnancy performed by a physician licensed in this state to practice medicine or surgery or osteopathic medicine or surgery when in the best clinical judgment of the physician the termination is performed to preserve the life or health of the pregnant person or of the fetus and every reasonable medical effort not inconsistent with preserving the life of the pregnant person is made to preserve the life of a viable fetus.

Iowa Code § 707.7(1), (4).

[12]The Iowa legislature recently enacted chapter 146B, which prohibits abortions after twenty weeks of fetal gestation other than cases of medical emergency. S.F. 471, 87th G.A., 1st Sess. § 3 (Iowa 2017) (to be codified at Iowa Code § 146B.2(2)(*a*)). Nevertheless, the legislature clarified that the Act "shall not be interpreted to . . . prohibit abortion prior to an unborn child reaching a postfertilization age of twenty weeks." *Id.* § 5. The legislation also allows a woman to maintain an action for actual damages against a physician who performs an abortion in violation of this chapter. *Id.* § 4 (to be codified at Iowa Code § 146B.3). The legislation was not made retroactive. *See* Iowa Code § 4.5 ("A statute is presumed to be prospective in its operation unless expressly made retrospective.").

confront daily. But under our tort law, financial compensation should be paid by the negligent physician if liability is proven.

**C. The Father's Wrongful-Birth Claim.** Jeremy, as the father of a profoundly disabled child, may be obligated to pay for his share of the child's care for the rest of his life. *See* Iowa Code § 252A.3(3) (outlining dependent support obligations). Defendants nevertheless contend that Jeremy cannot bring a claim for wrongful birth because he had no physician–patient relationship with them. Pamela testified Jeremy may have attended "some" prenatal appointments with her, but the record does not disclose whether Jeremy attended her obstetrical ultrasound or to what extent Jeremy relied on what Pamela was told by the defendants. Jeremy does not claim that he personally had a physician–patient relationship with any defendant.

Courts are divided as to whether physicians providing prenatal care owe a duty that extends to the father. Most courts specifically addressing the question have allowed the father's wrongful-birth claim to proceed. *See Khadim v. Lab. Corp. of Am.*, 838 F. Supp. 2d 448, 459–60 (W.D. Va. 2011) (applying Virginia law and ruling that genetic testing lab owed duty to both parents); *Keel*, 624 So. 2d at 1030 (reinstating wrongful-birth claims of both parents and noting that defendants, by failing to inform mother of possibility of congenital birth defects, "directly deprived her and derivatively, her husband," of the option to abort); *Andalon v. Superior Ct.*, 208 Cal. Rptr. 899, 905 (Ct. App. 1984) (holding the father "is manifestly a direct beneficiary of tort-duty imposed by virtue of [his wife's] doctor-patient relationship" with physician who failed to detect their child's Down syndrome); *Rich v. Foye*, 976 A.2d 819, 830 (Conn. Super. Ct. 2007) (rejecting defendants' argument they owed no duty to father on wrongful-birth claims arising from interpretation of

fetal ultrasound); *Chamberland v. Physicians for Women's Health, LLC*, No. CV010164040S, 2006 WL 437553, at *7 (Conn. Super. Ct. Feb. 6, 2006) ("The court also notes that most of the wrongful birth cases from other jurisdictions cited by both parties make no distinction between the duty owed to the mother and the father."); *DiNatale v. Lieberman*, 409 So. 2d 512, 513 (Fla. Dist. Ct. App. 1982) (noting the father "shares the legal obligation to provide for the child's care and support [and his] right is not dependent upon the mother's cause of action but is his individually"); *Lab. Corp. of Am. v. Hood*, 911 A.2d 841, 852 (Md. 2006) (answering certified question that genetic testing lab possibly owed duty to father dependent on fact-finding); *Geler v. Akawie*, 818 A.2d 402, 414 (N.J. Super. Ct. App. Div. 2003) (requiring retrial of wrongful-birth claims by both parents arising from negligent genetic counseling); *Estate of Amos v. Vanderbilt Univ.*, 62 S.W.3d 133, 138 (Tenn. 2001) (reinstating father's jury award in wrongful-birth action for negligent transmission of HIV virus to mother leading to death of their child exposed in utero). *But see Breyne v. Potter*, 574 S.E.2d 916, 921 (Ga. Ct. App. 2002) (holding physician who misdiagnosed Down syndrome leading to abortion owed no duty to unmarried father who was not his patient); *Molloy v. Meier*, 660 N.W.2d 444, 453 (Minn. Ct. App. 2003) (holding physician's duty of care did not extend to patient's husband who was not the biological father and never attended her prenatal appointments); *Broadnax v. Gonzales*, 809 N.E.2d 645, 649 n.3 (N.Y. 2004) ("The treating physician owes no duty of care to the expectant father."); *Krishnan v. Sepulveda*, 916 S.W.2d 478, 482 (Tex. 1995) (holding physician owed duty only to expectant mother, not the father); *Fruiterman v. Granata*, 668 S.E.2d 127, 135–36 (Va. 2008) (holding father's wrongful-birth claim failed because the defendant's prenatal services were provided to the mother

alone, not to the plaintiffs "as a couple"). Other courts allow the "parents" to bring claims for wrongful-birth without separately analyzing the father's right to recover.[13]

Although we have never addressed whether a physician providing prenatal care to the expectant mother owes a duty to the child's father, we have addressed the duty of physicians to third parties in other contexts. "It is hornbook law that in any tort case the threshold question is whether the defendant owed a legal duty to the plaintiff." *J.A.H.*, 589 N.W.2d at 258. "A legal duty 'is defined by the relationship between individuals; it is a legal obligation imposed upon one individual for the benefit of another person or particularized class of persons.'" *Id.* (quoting *Sankey v. Richenberger*, 456 N.W.2d 206, 209 (Iowa 1990)). "Whether, under a given set of facts, such a duty exists is a question of law." *Id.* (quoting *Leonard v. State*, 491 N.W.2d 508, 509 (Iowa 1992)). We generally look to three factors to determine whether a physician owed a duty to a nonpatient: "(1) the relationship between the parties, (2) reasonable foreseeability of harm to the person who is injured, and

---

[13]*See, e.g., Lininger*, 764 P.2d at 1207 ("[T]he Liningers may prove and recover those extraordinary medical and education expenses occasioned by Pierce's blindness."); *Garrison*, 581 A.2d at 292 ("If the health care provider deprives the *parents* of the ability to choose not to carry an unwell fetus to term, the provider may be held liable for the resulting extraordinary expenses of the parents for child care." (Emphasis added.)); *Siemieniec*, 512 N.E.2d at 705 (agreeing with the majority of courts "that an action for the wrongful birth of a genetically or congenitally defective child may be maintained by the *parents* of such child" (emphasis added)); *Viccaro*, 551 N.E.2d at 11 ("We agree with the general rule that the Viccaros are entitled to recover the extraordinary medical and educational expenses and other extraordinary costs associated with caring for Adam."); *Cote*, 513 A.2d at 351 ("We already have held that a wrongful birth defendant is liable for the pecuniary losses incurred by the *parents*." (Emphasis added.)); *Harbeson*, 656 P.2d at 488 ("The *parents*' right to prevent a defective child and correlative duty flowing from that right is the heart of the wrongful birth action." (Emphasis added.)); *Caserta*, 332 S.E.2d at 882 ("*[P]arents* may in a wrongful birth action recover the extraordinary costs for rearing a child with birth defects . . . ." (Emphasis added.)).

(3) public policy considerations." *Id.* We now review how we have applied these factors to date and their application to wrongful-birth cases.

In *Leonard,* a state mental hospital discharged a patient, Henry Parrish, to outpatient care after treating him for bipolar disorder. 491 N.W.2d at 510. Shortly after his release, Parrish returned to work and severely beat a coworker, John Leonard, without provocation. *Id.* Leonard sued the state. *Id.* Leonard did not know Parrish before his commitment and discharge, and Parrish's psychiatrist had never heard Parrish make any threats against Leonard. *Id.* at 511. We held as a matter of law the treating psychiatrist owed no duty to Leonard as a member of the general public. *Id.* at 512. We concluded the "risks to the general public posed by the negligent release of dangerous mental patients would be far outweighed by the disservice to the general public if treating physicians were subject to civil liability for discharge decisions." *Id.* We worried that "the treating physicians would indulge every presumption in favor of further restraint, out of fear of being sued." *Id.* (quoting *Sherrill v. Wilson,* 653 N.W.2d 661, 664 (Mo. 1983) (en banc)).

Similarly, in *Schmidt v. Mahoney,* we held a physician owed no duty to a motorist injured by his patient. 659 N.W.2d 552, 555 (Iowa 2003). Dr. Mahoney treated a woman for a seizure disorder, but failed to warn her not to drive. *Id.* at 553. She suffered a seizure and lost control of her vehicle, colliding with Schmidt's car. *Id.* Schmidt sued the doctor for negligence. *Id.* We affirmed the district court's ruling granting the doctor's motion to dismiss. *Id.* at 556. As in *Leonard,* we declined on public policy grounds to extend the physician's duty to members of the general public, fearing the resulting liability would adversely impact the

physician–patient relationship through overly restrictive recommendations. *Id.* at 555.

*Leonard* and *Schmidt* are distinguishable. Jeremy is not suing as a member of the general public, but rather, as the patient's husband at the time of the prenatal care and birth and as the father of their child. This ameliorates the concern for open-ended liability. *See Hood*, 911 A.2d at 852 (noting father's wrongful-birth claim "would not risk an extension [of tort duty] to 'an indeterminate class of people' . . . but only to the father of the child who would be responsible for the child's support"). Thus, we turn to our duty precedent in which the plaintiff had a close familial relationship with the medical defendant's patient.

In *J.A.H.*, we addressed a physician's duty to a son for negligent treatment of his mother by her therapist. 589 N.W.2d at 257. The son alleged the therapist's treatment caused his mother to develop false memories, damaging their parent–child relationship. *Id.* We observed that in medical negligence actions, a physician's duty to the patient arises from their contractual relationship. *Id.* at 260. But we observed that we had previously relaxed the privity requirement in professional negligence actions, especially for negligent medical care, and stated "lack of privity is not necessarily determinative on the question of duty." *Id.* at 260–61. We recognized it was foreseeable that the son would be harmed by "the fallout of the negligent mental health care to his mother," yet we did not base our decision on foreseeability. *Id.* at 261–62. Rather, we determined once again that public policy considerations precluded imposing a duty on therapists to nonpatient family members. *Id.* at 263. We noted the "problem of divided loyalties and the need to protect confidentiality." *Id.* Specifically, we stated that "[p]reserving confidentiality in a mental health setting is probably more important

than in any other type of medical setting." *Id.* We echoed concerns that a therapist might alter treatment to the patient's detriment to avoid liability to third parties. *Id.*

Those public policy concerns are not present in a wrongful-birth action. We do not see that the mother's prenatal care would be compromised, or patient confidentiality threatened, if physicians could be civilly liable for negligence to both the expectant mother *and* father. To the contrary, physicians providing prenatal care would have a greater incentive to improve fetal testing and disclosure to both parents if their liability for negligence extended to the father as well as the mother.

We find particularly compelling the father's joint legal obligation to support a disabled child. The physician–patient relationship is with the mother, not the father, but doctors providing prenatal care can easily foresee harm to both parents who must raise a profoundly disabled child. Indeed, physicians who negligently injure a baby during delivery are already liable in tort to both parents. *See Asher*, 846 N.W.2d at 499 (concluding that physician's scope of liability for birth injury was established as a matter of law and affirming judgment on jury verdict awarding damages to both parents and child).

Fathers also have a voice in reproductive decisions, although the ultimate decision to terminate a pregnancy belongs to the mother. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 898, 112 S. Ct. 2791, 2831 (1992). The plaintiffs in this case were married at the time of the prenatal care and birth, and it is undisputed that Jeremy is Z.P.'s father, with legal obligations to support his child. A husband has a "deep and proper concern and interest . . . in his wife's pregnancy and in the growth and development of the fetus she is carrying." *Id.* at 895, 112 S. Ct. at 2830 (alteration in original) (quoting *Planned Parenthood of*

*Cent. Mo. v. Danforth,* 428 U.S. 52, 69, 96 S. Ct. 2831, 2841 (1976)). Maryland's highest court expressly rejected the argument that the woman's sole right to choose to abort precluded recognizing her husband's right to sue for wrongful birth. *Hood,* 911 A.2d at 851 (noting that the plaintiffs, like many other married couples, would "jointly" decide whether to terminate a pregnancy); *see also Andalon,* 208 Cal. Rptr. at 905 (noting husband-father's injury "flows from his role as a participant in the reproductive life of the marital couple and its lawful choices [and noting t]he burdens of parental responsibility fall directly on his shoulders" (footnote omitted)). Although the father has no legal right to compel or prevent an abortion, he does have an interest in participating in decisions regarding family planning.[14]

For these reasons, we hold that a father-husband such as Jeremy may bring a wrongful-birth claim under Iowa law, notwithstanding his lack of a physician–patient relationship with the defendants.

**D. Recoverable Damages in This Wrongful-Birth Action to Be Determined on Remand.** The Plowmans seek damages for (1) their cost of ordinary care raising the child; (2) their cost of extraordinary care required for Z.P.'s life as a result of his disabilities; (3) their own pain, suffering, and mental anguish; and (4) their loss of income. They are not claiming any damages for loss of their child's consortium or services or for Pamela's labor and delivery of Z.P.

Because the district court granted defendants' motion for summary judgment on liability, it did not decide which damage claims can be submitted to the jury. A supreme court is "a court of review, not of first

---

[14]The Iowa legislature has also allowed a father of a fetus upon whom a partial-birth abortion is performed to sue the physician. *See* Iowa Code § 707.8A(4)(*a*).

view." *Cutter v. Wilkinson,* 544 U.S. 709, 718 n.7, 125 S. Ct. 2113, 2120 n.7 (2005). The defendants did not file motions for partial summary judgment on particular elements of damages. On this sparse appellate record, we decline to decide what damages are recoverable. On remand, the district court must determine which types of damages may be submitted to the jury under the factual record made by the parties.

**IV. Disposition.**

We reverse the district court's summary judgment and remand the case for further proceedings consistent with this opinion.

**DISTRICT COURT SUMMARY JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Cady, C.J., who concurs specially, and Mansfield, J., who dissents.

37

#15–0974, *Plowman v. Ft. Madison Cmty. Hosp.*

**CADY**, **Chief Justice (concurring specially).**

I concur in the opinion of the court. The claim described in the case fits within the existing framework of a medical malpractice tort, and the alleged wrongful conduct gives rise to damages. However, the damages recoverable under the tort must not hinge on the distinction between a child perceived as "normal" and a child perceived as "disabled." Such a distinction can be illusory and only risks unwarranted stereotypes and undeserved assumptions based on bias. *See* Anne Bloom, *The Radiating Effects of Torts*, 62 DePaul L. Rev. 229, 242 (2013); Wendy F. Hensel, *The Disabling Impact of Wrongful Birth and Wrongful Life Actions*, 40 Harv. C.R.-C.L. L. Rev. 141, 144 (2005). Such a distinction must be discontinued.

In *Nanke v. Napier,* we held a parent could not recover damages for a negligently performed abortion that resulted in the birth of a "normal, healthy child" because the benefits of parenthood exceeded the financial burdens associated with parenthood. 346 N.W.2d 520, 522 (Iowa 1984). In this case, we identify the injury claimed in *Nanke* as the birth of a healthy child when seeking to distinguish the injury here as the deprivation of a parent's ability to make an informed decision to terminate pregnancy. In truth, the injury in both cases is the same. In both cases, parents are deprived of the outcome of the decision they either made or would have made if given the opportunity. Thus, the real distinction between *Nanke* and this case is the perception that the child in *Nanke* was born normal and the child in this case was born disabled. *See* Anne Bloom & Paul Steven Miller, *Blindsight: How We See Disabilities in Tort Litigation*, 86 Wash. L. Rev. 709, 719–20 (2011). This means these cases instruct that damages are recoverable under this tort

only when the child is disabled. This holding implies that while the benefits of parenting "normal, healthy" children can outweigh the costs, the benefits of parenting a disabled child will not.

Society would be better served if we proceed forward with this tort by abandoning the inclination to distinguish people as either normal or disabled. *See* Richard K. Scotch, *Models of Disability and the Americans with Disabilities Act,* 21 Berkeley J. Emp. & Lab. L. 213, 214–15 (2000). Instead, damages under the tort should be recoverable when the extra financial burden of raising the child would be substantial enough to support a decision to terminate a pregnancy under prevailing community and medical standards. This standard does not impinge on the individual constitutional right to an abortion; it only permits damages associated with the decision when the extra expenses of parenthood would reasonably support the termination of a pregnancy. In this way, the reasonableness of the decision to terminate pregnancy will not hinge on identifying the child as disabled, but on the extra expenses associated with parenting the child. Those expenses describe the essence of the damages. Our law should in every instance seek to remove assumptions based on perceived differences in people.

39

#15–0974, *Plowman v. Ft. Madison Cmty. Hosp.*

**MANSFIELD, Justice (dissenting).**

I respectfully dissent because I cannot agree that we should create a cause of action for "wrongful birth."

Nothing compels us to establish a wrongful-birth cause of action. As plaintiffs' very able counsel conceded at oral argument, *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705 (1973), does not require this result. There is no constitutional imperative here.

In my view, the court's decision is incorrect for three reasons. First, this cause of action did not exist at common law and is contrary to traditional common law concepts. Second, Iowa statutes, specifically Iowa Rule of Civil Procedure 1.206, foreclose this cause of action. Third, there are good public policy reasons not to recognize the claim. *See Dier v. Peters*, 815 N.W.2d 1, 3 (Iowa 2012) (citing and applying these three factors in determining whether Iowa tort law allows an action for paternity fraud).

## I. Common Law Precedents Do Not Support This Claim.

The common law does not support this cause of action. At common law, parents could not recover for the wrongful birth of a child. *See Etkind v. Suarez*, 519 S.E.2d 210, 214 (Ga. 1999); *Hickman v. Grp. Health Plan, Inc.*, 396 N.W.2d 10, 13 (Minn. 1986); *Wood v. Univ. of Utah Med. Ctr.*, 67 P.3d 436, 442 (Utah 2002). This was true even though abortion was not illegal at common law. *See Abrams v. Foshee*, 3 Iowa 274, 278–80 (1856).

Furthermore, even if we were not constrained by Iowa statutes and could tinker with the common law in this area, there are good reasons not to do so. This is not a straight-and-simple case of medical malpractice, as the majority suggests. In general, a medical malpractice

claim cannot be pursued in the absence of physical harm. *See* Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 6, at 67 (Am. Law Inst. 2010) ("An actor whose negligence is a factual cause of physical harm is subject to liability for any such harm within the scope of liability . . . .").

Plaintiffs do not contend that the defendants' actions caused physical harm to Z—but rather that Z's birth as a severely disabled child has caused them economic and emotional harm. In the plaintiffs' words,

> A baby such as Z.P. is not the injury. The injury is that the parents were denied the right to make a deeply personal but informed decision whether to give birth to a potentially severely brain damaged child and willingly incur the foreseeable economic and emotional costs associated with caring for such a child.

I do not minimize the financial and personal burdens on the Plowmans of raising a severely disabled child. But this is not a typical medical malpractice claim.

It is true we have allowed medical malpractice claims to be pursued in the absence of physical injury when a breach of duty will "inevitably" result in mental anguish, pain and suffering. *See Oswald v. LeGrand*, 453 N.W.2d 634, 639–40 (Iowa 1990) (limiting the holding to "a combination of the two factors existing here: extremely rude behavior or crass insensitivity coupled with an unusual vulnerability on the part of the person receiving professional services"); *see also* Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 47(b) & cmt. *f*, at 175, 179 (Am. Law Inst. 2012) (allowing recovery for serious emotional harm in the context of "specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious emotional harm" while noting that "the mere fact that serious emotional harm was foreseeable under the facts of the specific case" is

insufficient). Yet even if one could argue for the *Oswald* exception here, plaintiffs' lawsuit has clearly traveled some distance from a traditional medical malpractice claim.

My colleagues analogize the wrongful-birth claim to a failure-to-diagnose or a failure-to-provide-informed-consent cause of action. These off-base comparisons do not advance the majority's analysis. Under a failure-to-diagnose claim, the physician can be sued *because* his or her negligence has resulted in physical harm, or at least greater physical harm than would otherwise have occurred. *See, e.g.*, *Murtha v. Cahalan*, 745 N.W.2d 711, 716 (Iowa 2008) ("[T]he 'injury' is the development of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment." (emphasis omitted) (quoting *DeBoer v. Brown*, 673 P.2d 912, 914 (Ariz. 1983) (en banc))). Similarly, the informed-consent theory permits a physician to be sued only when inadequate disclosure of the risks of a "proposed medical procedure" results in "injury." *See Pauscher v. Iowa Methodist Med. Ctr.*, 408 N.W.2d 355, 359–60 (Iowa 1987). Here, again, the alleged breach of duty has not caused physical harm.

## II. This Claim Is Contrary to an Iowa Statute.

Furthermore, existing, longstanding Iowa legislation weighs against the creation of the wrongful-birth cause of action and, in my view, forecloses it. In 1860, our legislature enacted what is now Iowa Rule of Civil Procedure 1.206. *See* Iowa Code § 2792 (1860); *see also id.* § 4187 (repealing in whole the 1851 Code of Civil Practice). The 1860 law provided,

> A father, or in case of his death or imprisonment or desertion of his family, the mother, may prosecute as plaintiff an action for the expenses and actual loss of service resulting from injury or death of a minor child.

Iowa Code § 2792.

Other than amendments eliminating the preference for the father, this statute has remained basically unchanged for over 150 years.[15] And until now, we have adhered to its limits. For example, in 1926, we did not let a father recover for the wrongful death of a thirteen-year-old son who had been emancipated. *Lipovac v. Iowa Ry. & Light Co.*, 202 Iowa 517, 522–23, 210 N.W. 573, 575–76 (1926). We explained that the father "must bring himself within [the statute's] terms in order to be entitled to recover." *Id.* at 519, 210 N.W. at 574 (recognizing that an action to recover under the statute "cannot be extended to cases omitted from its provisions or applied to those not fairly within its purview"). In 1971, we held that emotional distress damages were not recoverable because the statute was limited to "expense" and "loss of services." *See Wardlow v. City of Keokuk*, 190 N.W.2d 439, 448 (Iowa 1971) (noting that recovery is "limited by the precise language of [the statute]"). We have also declined to allow parents to recover damages for injury or death of an adult child, reasoning, "The legislature has defined the remedies available for injury to or death of a person, and thus, any recovery is limited to those remedies provided by the legislature." *Kulish v. W. Side Unlimited Corp.*, 545 N.W.2d 860, 862 (Iowa 1996); *see also Kuta v. Newberg*, 600 N.W.2d 280, 287 (Iowa 1999) (denying recovery of consortium damages for an adult child under the statute even though "public policy might well support a different rule").

---

[15]In 1973, the legislature eliminated the paternal preference. *See* 1973 Iowa Acts ch. 316, at 660. Current Iowa Rule of Civil Procedure 1.206 provides, "A parent, or the parents, may sue for the expense and actual loss of services, companionship and society resulting from injury to or death of a minor child."

In *Dunn v. Rose Way, Inc.*, we held that a father could recover under this statute for the death of a viable unborn child. 333 N.W.2d 830, 833 (Iowa 1983). But we did so on the basis of close textual analysis of rule 1.206. We explained, "A minor person is simply one who has not yet reached majority, a category which certainly includes unborn persons." *Id.*

Thus, to date, we have respected the boundaries of rule 1.206. Under this statute, parents cannot sue for emotional distress because the statute is limited to recovery of expenses and loss of services. Likewise, until the law was changed, parents could not sue for the injury or death of an adult child under rule 1.206 because it only referenced minor children.[16] And while parents can sue for the death of an unborn child, this is only because we have concluded an unborn child fits within rule 1.206's definition of a minor child.

Rule 1.206 thus controls a parent's right to recover for tortious conduct affecting a minor child. *See Wardlow*, 190 N.W.2d at 443; *see also Dunn*, 333 N.W.2d at 833 ("What is involved here is a right of recovery given to a parent."). And the statute limits recovery to circumstances when there is an "injury to" or the "death of" a minor child. No part of rule 1.206 authorizes recovery for a child's *birth*. Consistent with our prior cases, we should continue to honor the legislative lines that rule 1.206 has drawn. Because the statute includes

---

[16]In 2007, the legislature enacted a new statute, which provided,

> A parent or the parents of a child may recover for the expense and actual loss of services, companionship, and society resulting from injury to or death of a minor child and may recover for the expense and actual loss of services, companionship, and society resulting from the death of an adult child.

2007 Iowa Acts ch. 132, § 1 (codified at Iowa Code § 613.15A (2011)).

"injury" and "death" but not "birth," parents may recover for an injury to a minor child or the death of a minor child, but not for the minor child's birth. Otherwise, we would be rewriting the statute.

The court says that rule 1.206 does not "speak to" the wrongful-birth cause of action because such a claim does not involve *injury* to the minor child. However, by the same logic, we could just as well have said that rule 1.206 does not "speak to" claims relating to adult children or claims for emotional distress damages. We didn't. Under the interpretive canon *expressio unius est exclusio alterius*, the legislature's decision to include recovery for "injury to" or "death of" a minor child also means it did not intend to include recovery for the *birth* of a child. *See Homan v. Branstad*, 887 N.W.2d 153, 166 (Iowa 2016) ("It is an established rule of statutory construction that 'legislative intent is expressed by omission as well as by inclusion, and the express mention of one thing implies the exclusion of others not so mentioned.' " (quoting *Marcus v. Young*, 538 N.W.2d 285, 289 (Iowa 1995)). This rule of construction has special force here given that a wrongful-birth cause of action has no footing in traditional common law.

### III. Public Policy Considerations Should Also Defeat This Claim.

Finally, there are valid public policy reasons not to recognize this claim. It goes without saying that a main source of *public* policy should be the enactments of the *public's representatives*, namely the legislature. *See Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106, 110–11 (Iowa 2011) (discussing public policy in the context of a wrongful-discharge claim). Unless a public policy is "clear and apparent," "public policy is best left to our legislative branch of government to decide as representatives of

the people." *Galloway v. State*, 790 N.W.2d 252, 259 (Iowa 2010) (Cady, J., dissenting).

Bowing to this approach in part, the court cites recent informed-consent laws relating to abortion as reflective of legislative policy. However, the last time the Iowa legislature was actually free to set policy in this area predated *Roe v. Wade*. At that time the legislature made performing an abortion illegal, except to save the life of the mother. *See* Iowa Code § 701.1 (1973).[17] An honest appraisal of the legislature's Iowa Code section 146A.1 would find that it is intended to *discourage*, not encourage, abortions. The statute sets forth prerequisites for abortion only, not for carrying a pregnancy to term. *See* Iowa Code § 146A.1 (2017). It requires some creativity to read section 146A.1 as support for the new cause of action the court establishes today.[18]

---

[17]The legislature first criminalized the performance of any abortion in 1859. *See* 1859 Iowa Acts ch. 58, § 1 (codified at Iowa Code § 4221 (1860)). Aside from renumbering and minor changes, the statute remained unchanged until it was substantially amended in 1977 following *Roe v. Wade*. *See* 1976 Iowa Acts ch. 1245, ch. 4, § 526 (repealing Iowa Code § 701.1 (1977)); *id.* ch. 1245, ch. 1, § 707 (enacting Iowa Code § 707.7 (1979)).

[18]Section 146A.1 is entitled "Prerequisites for an abortion," and at the time of the alleged malpractice read as follows:

> Except in the case of a medical emergency, as defined in section 135L.1, for any woman, the physician shall certify both of the following before performing an abortion:
>
> 1. That the woman has been given the opportunity to view an ultrasound image of the fetus as part of the standard of care.
>
> 2. That the woman has been provided information regarding the options relative to a pregnancy, including continuing the pregnancy to term and retaining parental rights following the child's birth, continuing the pregnancy to term and placing the child for adoption, and terminating the pregnancy.

Iowa Code § 146A.1. In the 2017 session, the legislature added more prerequisites for an abortion, including a seventy-two hour waiting period. *See* S.F. 471, 87th G.A., 1st Sess. § 1 (Iowa 2017) (to be codified at Iowa Code § 146A.1(1)).

Also relevant from a public policy perspective are the consequences of a particular ruling. *See, e.g.*, *Mulhern v. Catholic Health Initiatives*, 799 N.W.2d 104, 121–22 (Iowa 2011). In my view, the court's ruling leads to a slippery slope. True, today's decision is limited to a "severely disabled child." But the court does not define the term. What if testing indicates the child will be born blind or without a hand? Is that enough?

The court's decision also opens up the possibility for other claims. Can a mother sue a father for not telling her that he carried a genetic disorder, on the theory that she would otherwise have had an abortion? Can a father sue a mother for not telling him she carried a genetic disorder, on the theory that he would not have had unprotected sex? Can a couple that relies on an outside sperm donor sue the source of that donation in tort?

Or suppose a physician recommends a potentially life-saving course of treatment for a seriously ill octogenarian whose adult children hold medical power of attorney. The children agree to the course of treatment, which prolongs the octogenarian's life but doesn't alleviate his misery. Instead, it drains the remaining assets of his estate. The majority opinion opens up the possibility that the children could sue for "wrongful prolonging of life."

Another unanswered question is how one will select a jury in a wrongful-birth case. Many Iowans have deep-seated moral and religious objections to abortion, even if the unborn child has a severe disability. This raises the specter of a highly intrusive and uncomfortable voir dire, leading to the exclusion of a large swath of our population from the jury panel. *See Thornhill v. Midwest Physician Ctr. of Orland Park*, 787 N.E.2d 247, 257 (Ill. App. Ct. 2003) ("The court excused 11 potential jurors based upon their opinions regarding abortion."); *Wuth ex rel. Kessler v.*

*Lab. Corp. of Am.*, 359 P.3d 841, 852 (Wash. Ct. App. 2015) ("Jury selection began on October 21, 2013. On the Wuths' motion, the trial court employed a written juror questionnaire and individual questioning of some prospective jurors to determine whether they were able to render an impartial verdict. The questionnaire asked whether the prospective jurors believed abortion is morally wrong or should be illegal, whether they had close contact with a disabled child, whether they had been a party to medical negligence lawsuit and whether they knew any of the parties. Jurors who responded affirmatively to any of the questions were brought in for individual questioning.").

The best argument the court has for its ruling is that it provides greater motivation for physicians to provide more accurate diagnoses of conditions in unborn children. I agree that courts should take incentives into account in deciding cases, particularly under the common law. I also agree that traditional tort law works well and does a good job of internalizing the costs of negligent conduct. Yet I question whether the majority's incentive is needed or beneficial here. In a typical medical malpractice case, the causation inquiry is a *scientific* one: Did the physician's negligence cause the injury? Here, though, the causation inquiry is a *human* one: If the risks of a disability had been accurately disclosed, would the woman have terminated her pregnancy? Given the type of causation inquiry the factfinder must resolve, there is a possibility of overdeterrence. Although this matter is not part of the present appeal, it is a subject of disagreement among the parties, with the defendants pointing out that the plaintiff declined her physician's offer of amniocentesis during a subsequent pregnancy.

I would have no problem with a potential breach of contract claim against a physician who contractually assumes a duty to provide a

competent diagnosis of an unborn child's condition. Parties are today free by private arrangement to allocate this responsibility. This could also avoid any question as to what course of action would have been taken and eliminate the possible overdeterrence problem I have mentioned in the preceding paragraph.

As the Kentucky Supreme Court noted when it rejected the wrongful-birth cause of action,

> The Bogans believe that patients should have a breach of contract action against the physicians who offered and charged for diagnostic prenatal testing, yet who allegedly did not perform those services correctly. Despite our holding denying the tort claim as a matter of law, a physician who contracts and charges for a service, such as a prenatal ultrasound and consequent opinion as to the results of the ultrasound, is liable for any breach of contract in this regard.

*Grubbs ex rel. Grubbs v. Barbourville Family Health Ctr., P.S.C.*, 120 S.W.3d 682, 691 (Ky. 2003).

## IV. Conclusion.

For all these reasons, I would affirm the grant of summary judgment and let the general assembly decide whether to authorize this cause of action.[19]

---

[19]The majority puts the shoe on the other foot, stating, "If the legislature disagrees with our decision, it is free to enact a statute precluding wrongful-birth claims." This observation is undoubtedly true. In several states, legislatures have enacted statutes to overturn court decisions permitting wrongful-birth claims. *See, e.g., Blake v. Cruz*, 698 P.2d 315, 320–21 (Idaho 1984), *superseded by statute*, Idaho Code Ann. § 5-334(1) (West, Westlaw current through laws enacted as of Jan. 18, 2017), *as recognized in Vanvooren v. Astin*, 111 P.3d 125, 127–28 (Idaho 2005). However, I would not impose that burden on the Iowa General Assembly. In our system of government, it is the legislature's job, not ours, generally to take the initiative on matters of public policy.