**IN THE COURT OF APPEALS OF IOWA**

No. 24-0862
Filed January 9, 2025

**IN THE INTEREST OF O.W.,**
**Minor Child,**

**S.M., Custodian,**
　　　Petitioner-Appellee,

**B.W., Father,**
　　　Respondent-Appellant,

**and**

**C.P., Mother,**
　　　Respondent.

_____

　　　Appeal from the Iowa District Court for Polk County, Lawrence P. McLellan, Judge.

　　　A father appeals the termination-of-parental-rights order concluding he abandoned his son under Iowa Code chapter 600A (2024). **AFFIRMED.**

　　　Jordan Hutchinson of Hutchinson Law Firm, PLC, West Des Moines, and Sarah E. Wilson of Sarah E. Wilson Law Firm, PLC, Ankeny, for appellant father.

　　　Shayla L. McCormally of McCormally & Cosgrove, P.L.L.C., Des Moines, for appellee custodian.

　　　Penny B. Reimer of Reimer Mediation & Law, Cumming, guardian ad litem for minor child.

　　　Heard by Tabor, C.J., and Buller and Sandy, JJ.

**TABOR, Chief Judge.**

A father, B.W., challenges the termination of his parental rights to his son, O.W., under Iowa Code section 600A.8(3)(a) (2024).  He raises two issues.  First, he argues that section 600A.8(3) is unconstitutional—both on its face and as applied—because it shifts the burden to the parent to rebut a presumption of abandonment.  Second, B.W. contends that the child's legal custodian—who placed O.W. with prospective adoptive parents in New York—did not offer clear and convincing evidence that he abandoned the child or that termination was in O.W.'s best interests.[1]

On the first argument, B.W. did not raise a facial constitutional challenge in the district court.  Thus, we have nothing to review.  By contrast, he minimally preserved error on the as-applied challenge.  But in resolving that issue, we find no constitutional violation.  On the second issue, we give deference to the factual findings of the district court, especially on witness credibility.  After finding B.W.'s testimony was not entirely reliable, the court decided that S.M. presented clear and convincing proof of abandonment.  The court also found that it was in O.W.'s best interests to be adopted.  After our de novo review of the record, we reach the same conclusions as the district court.

## I.       Facts and Prior Proceedings

How the biological parents met and how their relationship quickly took off and just as quickly broke down is relevant to this appeal.  B.W. met C.P. when she started buying marijuana from him in 2021.  Their relationship became romantic in

---

[1] Attorney S.M. is the child's legal custodian.  She assumed that role after the child's mother, C.P., signed a release of custody under Iowa Code section 600A.4.

late 2022 or early 2023. Complicating their situation, both had other entanglements. C.P. had two children from another relationship and was living with their father. B.W. was living with a different girlfriend and her child. Despite those complications, B.W. and C.P. decided to live together.

B.W. and C.P. moved into an apartment with a mutual friend and C.P.'s two children in March 2023. Around that time, C.P. loaned B.W. $1900 so he could break the lease with his prior girlfriend and join the lease at the new apartment. According to C.P., her relationship with B.W. "definitely progressed very quickly." Their text messages reflect conversations about marriage and having a baby together. In that vein, C.P. testified that she and B.W. "were actively trying" to conceive a child. She discovered she was pregnant on April 13, 2023. She went to B.W.'s workplace that day and told him about the pregnancy. According to C.P., B.W. was excited about the news at first but after coming home from work,

> He looked very zoned out and very not there, and I thought when he got home that night, it was going to be like a big, happy evening, and he just kind of sat on his computer, ignoring, so I said, "Is everything okay?" and tried to figure out if something was wrong, and that's when he told me that he wasn't sure that he made the right decision, that he was scared. And he kept trying to bring up that he . . . wasn't ready, that he didn't think he was ready, that this is maybe a bad idea. And finally, I just said, "Did you—do you want me to have an abortion?" and he said, "I believe that would be easiest."

C.P. testified that after their conversation that evening, she was "very distraught" because she had believed that B.W. wanted a baby, and the fact that he "change[d] [his] mind was hard to deal with."

B.W. agreed that he was initially excited about the news of C.P.'s pregnancy and called his father on April 13 to tell him he was going to be a grandfather. But soon, B.W. shared with C.P. that he "didn't believe [he] was ready to parent" and

suggested to her that "[i]t might be easier" if she had an abortion. He recalled that his change of heart upset C.P. But according to B.W., he and C.P. mutually agreed that she would end the pregnancy and he began "working towards gathering money to pay for an abortion." C.P.'s recollections were similar. She testified that they "had several conversations through the next week" about terminating the pregnancy and she made it clear to B.W. that she "needed money from him to get an abortion."

By mid-May, the text messages between B.W. and C.P. reflected their deteriorating relationship. On May 16, C.P. texted: "I hate what we've become" and "I hate that I was stupid enough to let you [put] a baby in me and then for you to just fucking abandon me emotionally and in every other way." B.W. responded:

> Lately I've heard a lot about how much pain you're in and how ultimately it's my fault cause there's "a thing in your belly" now. You consistently making me feel bad for something I already feel terrible about, something that is going to be taken care of. I didn't abandon you. I stated I didn't think [I] was really ready like I thought and I'm gathering funds to get this appointment done so that way [you] can not be in pain cause of the thing I did.

Three days later, a flurry of text messages between C.P. and B.W. documented the end of their relationship.

> C.P.— [I'm] not sure I want you around in the future. You've hurt me really badly
> B.W.— I'll start packin my stuff when I get home then and stay at my dad's or something[.] I really don't know what to make of me being the root of all the issues.
> C.P.— [I'm] left feeling like a shadow of the person I was when I was first with you. And now I'm pregnant and feeling so so so unloved always
>      . . . .
> B.W.— I really don't understand how. I got you pregnant. I stated I didn't think I was ready so we talked about A appointments. I need to gather funds to help so that's no longer an issue. You haven't had a job since the massage place . . . you've been doing

coke and drinking while pregnant, [I fail] to understand how I can be the only issue right now [making] things so bad.

. . . .

C.P.— Bc if you're late on rent. Can't pay me back my 1900 YOU OWE ME—so don't even bring up me not having a job when you owe me a fuck ton of money[.]

How the fuck are you gonna pay for an abortion[.]

I've been doing drugs hoping to fix your mess up

B.W.— You said you'd do it on your own before I said I'd help[.] That's not a way to do it though wtf.

Their text messages on May 19 continued:

C.P.— The fact that you convinced me to bring a baby into this world and then you ripped that whole thing from me after getting me pregnant you're fucking disgusting

B.W.— Selling some plants and my car was gonna pay for a lot of everything else

C.P.— [I'm] so hurt

B.W.— I simply stated I didn't know that I was really ready. Apparently that's normal for new fathers.

C.P.— No you wanted to get [rid] of it

. . . .

B.W.— You brought up abortion and how if I wasn't sure you didn't want to force it on me[.]

I never said I want it gone I said I'm scared

C.P.— No. That's not how it went[.] Don't fucking act like it is

B.W.— I agreed to the abortion because honestly it seemed like the easiest solution for both of us given our situations

. . . .

C.P.— I look so stupid[.] I wrap[ped] the test all cute[.] Thought it was happy[.] I told my best friend

B.W.— I was excited.

C.P.— And then you avoided me for days

B.W.— I was also [terrified]

C.P.— Told me you weren't ready

B.W.— I didn't [avoid]

C.P.— And then haven't offered love or support once

B.W.— I was panicking

C.P.— You treat me like shit[.] And I'm over it

B.W.— Well. This week and next week I'll be working towards that appointment for you. After that I'll pay down the 1900 probably gonna come from selling the [M]iata.

The text messages went on:

> B.W.— Tonight I'll start packing my stuff and talk to my dad about moving in with him or my cousin.
>
> I don't see how I've treated you like shit. . . .  I don't call you names.  I don't hit you.  I don't call you dumb.  I don't belittle you [despite what] you think I've been working later hours in attempt to get extra money [for] the abortion.  But I somehow treat you like shit. . . .
>
> You've been drinking and doing coke with a baby in you that I'm trying to get money to healthy remove so you can feel better and not like shit all the time and I'm still treating you like shit?  I'm really trying to do things right
>
> C.P.— You don't get to judge me for things I do when you told me you didn't want this baby[.]
>
> That went out the window the second [you] said I should get an abortion
>
> B.W.— You brought it up I agreed I never once brought up the abortion on my own.
>
> C.P.— I won't be having this talk anymore[.]  Please just get away from me forever
>
> B.W.— Okay . . . .  But whatever I'll pack and get [going].  I'll send you money when it comes in

B.W. testified about the May 19 argument with C.P.  According to B.W., "She specifically told me to never talk to her again.  She doesn't want to see my face."  He also recalled that when he asked her why she was drinking and using cocaine while she was pregnant, she answered: "Because I had been trying to kill the mistake you put inside of me."

Key to his defense on the claim of abandonment, B.W. testified that C.P. described the future of her pregnancy in these terms: "There's nothing for you to worry about.  I've taken care of it."  B.W. claimed that "when she said she'd taken care of it and there was nothing left to worry about, I thought it was in respect to the termination that she said that she was trying to do."  B.W. said they never discussed the abortion after May 19 "[b]ecause I was told that there was no more child."

After he moved out of the apartment, B.W. told his father that C.P. "was doing some drugs and that she decided to terminate the pregnancy." But B.W. admitted that C.P. "did not tell me explicitly that she had an abortion," and there was no mention in any of their text messages that the pregnancy had ended. He also admitted that he never knew the baby was gone, but he "assumed" so "[b]ased on previous context."

In her testimony, C.P. offered a similar recollection of their falling out but with a slightly different emphasis. C.P. recalled, "After fighting continuously, asking for money that wasn't coming, I told him that I would take care of it myself." But she denied telling B.W. that she had an abortion. She also testified, "It's very clear to me that there was no assumption made that I had terminated my pregnancy."

After May 19, B.W. and C.P. communicated sporadically by text message—mostly about B.W. retrieving his belongings from the apartment and about the money he owed her. Their last exchange was on June 26. In that conversation, C.P. stated: "[K]nocking someone up intentionally and then not helping and dipping is fucked," and "You're just another dead beat fake ass baby daddy." C.P. sent a final text message to B.W. on September 14: "I honestly have no idea how you sleep at night knowing you took 2k from me dude." The message was marked delivered, but B.W. did not respond.

B.W. testified that his cell phone broke after he moved out, so he changed numbers. But he did not share his new phone number with C.P. He also claimed that C.P. blocked him on Facebook and Cash App,[2] which she denied. According

---

[2] Cash App is a mobile application that C.P. and B.W. used to exchange money.

to B.W., he believed that C.P. was no longer pregnant, and he stopped contacting her because he respected her decision to end their communications.

For her part, C.P. kept the same phone number and continued living in the same apartment after B.W. moved out. And contrary to B.W.'s assumption, she did not end the pregnancy. She testified that she did not get an abortion because B.W. never gave her the money to have one, and "[b]y the time that [she] had gotten another job and started to work out finances, Iowa's laws did not allow [her] to." She started looking for an adoptive family when she was "around thirty-five, thirty-four weeks" pregnant. According to her testimony, she "went through over 100, 130 different people who reached out to [her], and had FaceTimes with many of them, talked to a lot of them before making a decision." Eventually, she chose "an extremely stable and loving couple that have been together for a lot of years, and have both great careers and great family lives of their own" to be the child's adoptive parents.

C.P. gave birth to the child, O.W., in mid-December 2023.[3] The prospective adoptive parents were present for the delivery. C.P. testified that she did not notify B.W. about the birth or the adoption or place his name on the birth certificate. When her lawyers[4] "tried to contact [B.W.], no one was able to." O.W. has been in the care of the prospective adoptive parents in New York City since shortly after he was born. C.P. has maintained contact, receiving photos and updates about O.W. from them.

---

[3] O.W. shares his last name with one of his prospective adoptive parents. C.P. did not list B.W. as O.W.'s father on his birth certificate.
[4] C.P. was not represented by an attorney at the termination trial. She appeared to be referring to S.M., the child's legal custodian.

On December 19, C.P. signed a form releasing O.W.'s custody to S.M. as his legal custodian for adoptive placement. The release stated that B.W. was O.W.'s father, but he did not sign it. Eight days later, S.M. petitioned to terminate the parental rights of C.P. and B.W.[5] Along with the petition, S.M. also moved to appoint attorney Penny Reimer as O.W.'s guardian ad litem (GAL).

On January 2, 2024, a process server delivered notice of the termination petition to B.W.'s father, R.W., at his home. Not until his father contacted him about that notice did B.W. know that C.P. had continued the pregnancy and the child had been born. After processing that news, B.W. hired attorneys and filed an answer contesting the termination on January 19. That same day, B.W.'s attorney emailed S.M. to ask for "video call visits with the placement family so that he can meet his son and get updates." His attorney also shared B.W.'s plan to undergo paternity testing. To facilitate the testing, the attorney asked for contact information for the placement family.

Also that day, C.P. sent several Facebook messages to B.W.: "I will do everything to make sure you never see that baby . . . . Don't you dare take that baby from that couple[.] You could never do what they can for him[.] Fuck you from the bottom of my heart." After sending those messages, C.P. blocked B.W. on Facebook.

A few days later, S.M. responded to the email about paternity testing. She did not provide B.W. with contact information for the placement family. Instead,

---

[5] The original petition alleged no statutory grounds for termination.

S.M. confirmed that the testing company could "use [her] information on behalf of the adoptive family and we will take it from there."

On February 16, DNA testing confirmed that B.W. is O.W.'s father. Five days later, B.W.'s attorney again emailed S.M. saying that he was "ready and willing to assume physical care immediately." The email added: "Pending a change in placement, [B.W.] again requests to set up video call visits, beginning as soon as possible, with the family in New York so that he can meet his son and get updates."

S.M. rejected that request, asserting that she was "confident" that B.W.'s rights would be terminated. Reimer, O.W.'s GAL, joined the conversation to say that she agreed with S.M.: "I don't think it's in my client's best interest to start contact when I do believe the [termination] will be proved up at our trial."

In late February, S.M. filed an amended petition alleging abandonment and sexual abuse as grounds for terminating B.W.'s rights.[6] B.W. filed a second answer, denying the allegations and again asking for O.W. to "be placed with him immediately."

Fast forward to the April trial. B.W. testified that after receiving notice of the termination petition, he prepared to assume custody of O.W. For example, he bought a crib, car seat, baby toys, books, clothes, and diapers; cleaned and baby-proofed the townhouse where he currently lives; set up a nursery in his bedroom;

---

[6] The guardian ad litem reported that C.P. "stated that the sexual encounter that led to this pregnancy was not via consent." But at the trial, C.P.'s testimony was equivocal on this point. When asked on cross-examination if she was making a claim that her pregnancy resulted from nonconsensual sex, she responded: "There's a possibility for it." The court did not rule on the sexual-abuse ground.

and took a parenting class. He also testified that he had quit using marijuana and removed "anything that was drug-related" from his home. And he made plans for his father and stepmother to provide care for O.W. while he is working. When asked if he filed anything with Iowa's Putative Father Registry,[7] B.W. said he did not because he "didn't know that it existed." The other main witness was C.P., who testified that before B.W. moved out of their apartment, he offered her no support to continue her pregnancy.

After hearing all the evidence, the court granted the petition to terminate B.W.'s parental rights under section 600A.8(3), finding he had abandoned the child. In that order, the court made several credibility findings. First, the court recalled that C.P. testified that B.W. "raised the issue of getting an abortion."[8] And the court found that her testimony was more credible than B.W.'s on that issue. Second, on whether she told B.W. that she had terminated the pregnancy, the court again found her testimony more believable. Third, the court found B.W.'s testimony that he quit using drugs nine months before trial not to be credible. Ultimately, the court found that S.M. proved by clear and convincing evidence that B.W. abandoned O.W. and that termination was in the child's best interests.[9]

B.W. appeals.

---

[7] Under Iowa Code section 144.12A, a putative father may file a declaration of paternity any time from before the child is born until the filing of a termination petition.

[8] On our review, C.P.'s testimony was more nuanced than suggested in the district court's order.

[9] The court also terminated C.P.'s parental rights under section 600A.8(1) based on C.P.'s consent. The court noted that C.P. requested she be allowed to revoke her consent to terminate her parental rights if B.W.'s rights were not terminated.

## II.      Scope and Standards of Review

We review constitutional claims de novo. *In re C.M.*, 652 N.W.2d 204, 209 (Iowa 2002). We also review termination-of-parental-rights proceedings under Iowa Code chapter 600A de novo. *In re G.A.*, 826 N.W.2d 125, 127 (Iowa Ct. App. 2012). "We give deference to the factual findings of the [district] court, especially those relating to witness credibility, but we are not bound by those determinations." *Id.*

## III.      Analysis

## A.  Constitutional Claims

B.W. raises a two-fold challenge to the constitutionality of Iowa Code section 600A.8(3), the abandonment ground for private terminations. First, he claims that the statute—on its face—violates due process under both the Fourteenth Amendment of the United States Constitution and Article I, section 9 of the Iowa Constitution. Second, he argues that the district court unconstitutionally applied the statute in his case.

Before we reach the merits of either claim, we must determine whether B.W. preserved error. "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). B.W. claims he preserved error by raising the constitution in his oral motion to dismiss at the termination trial. In that motion, his counsel stated:

> As argued by [S.M.], Iowa Code section 600A.8(3) would violate both the Fourteenth Amendment of the U.S. Constitution and parents' due process rights in the Iowa Constitution. This court is faced with an opportunity to read a statute in two ways. One of them being non-violative of the constitution, and the other clearly violating [B.W.'s]

constitutional rights. The court should elect to interpret the statute in the fashion that does not infringe upon [B.W.'s] rights.

The court reserved ruling on the motion until its final decision. But the final ruling did not address B.W.'s constitutional argument. Given that void, S.M. argues that he failed to preserve error on both his facial and as-applied challenges.

We agree that B.W.'s motion to dismiss did not preserve error on his facial challenge. In urging a facial claim, the challenger must show that the statute is "unconstitutional *in all its applications*." *State v. Hightower*, 8 N.W.3d 527, 540 (Iowa 2024) (citation omitted). That was not the due process argument advanced by B.W.'s counsel. In fact, he told the court that the statute could be read *not* to violate the constitution. But we will assume that error was minimally preserved for his as-applied constitutional challenge and elect to reach the merits of that claim. *See 33 Carpenters Constr., Inc. v. State Farm Life & Cas. Co.*, 939 N.W.2d 69, 76 (Iowa 2020).

B.W. claims that as applied here, section 600A.8(3) violates his due process rights. "Our statutes are accorded a strong presumption of constitutionality, and the burden of proving the contrary beyond a reasonable doubt is on the party challenging it." *In re B.G.C.*, 496 N.W.2d 239, 244 (Iowa 1992) (internal citation omitted). The relevant portion of the statute states:

> The juvenile court shall base its findings and order under section 600A.9 on clear and convincing proof. The following shall be, either separately or jointly, grounds for ordering termination of parental rights:
> . . . .
> 3. The parent has abandoned the child. For the purposes of this subsection, a parent is deemed to have abandoned a child as follows:

a. (1) If the child is less than six months of age when the termination hearing is held, a parent is deemed to have abandoned the child unless the parent does all of the following:
(a) Demonstrates a willingness to assume custody of the child rather than merely objecting to the termination of parental rights.
(b) Takes prompt action to establish a parental relationship with the child.
(c) Demonstrates, through actions, a commitment to the child.

Iowa Code § 600A.8(3)(a)(1).

B.W. contends that in applying the statute, the district court improperly shifted the burden—requiring him to prove that he did *not* abandon O.W.—rather than requiring S.M. to prove that he *did* abandon O.W. He contends that shift "unconstitutionally interfered with his fundamental right to parenthood." He points to two sentences in the court's ruling to support this claim: "There was no evidence that [B.W.] took any measure to establish legal responsibility for the child prior to the child's birth"; and "[B.W.] failed to present evidence that he engaged in these activities prior to the child's birth."

S.M. counters that "B.W. was afforded due process" because "he had a trial where Petitioner had the burden to meet the standards set out under the law." S.M. asserts that "B.W. had the right to put on evidence and argue his case or rebut Petitioner's evidence, but that does not shift the burden from the Petitioner. B.W. did not have any obligation under the law to prove any fact."

B.W. is correct that the district court referenced the evidence he presented. But the court also stated that S.M. "must first prove by clear and convincing evidence the legal grounds relied upon for ordering termination of parental rights." When discussing section 600A.8(3)(a)(1), the court explained that "[t]he burden is on [S.M.] to establish that the parent failed to meet one of the statutory

requirements because the parent must meet *all* three requirements for the court to find that the parent has not abandoned the child." The court then found that S.M. "proved by clear and convincing evidence" that B.W. failed to meet all three statutory requirements, and therefore "[S.M.] established by clear and convincing evidence [B.W.] abandoned the child." On this record, we do not find that the district court shifted the burden onto B.W. to rebut a presumption of abandonment when it applied section 600A.8(3). Instead, it stated more than once that S.M. bore the burden to prove abandonment by clear and convincing evidence and found that S.M. met that burden. B.W.'s due process rights were not violated by the district court's application of the statute.

### B. Termination of B.W.'s Parental Rights

Beyond his constitutional claims, B.W. argues that the district court erred in finding that his parental rights should be terminated. "Termination proceedings under Iowa Code chapter 600A are a two-step process." *In re Q.G.*, 911 N.W.2d 761, 770 (Iowa 2018). S.M. "must first show by clear and convincing evidence a threshold event has occurred that opens the door for potential termination of parental rights." *See id.* (citing Iowa Code § 600A.8). Once S.M. passes that threshold, she must show by clear and convincing evidence that termination is in O.W.'s best interests. *See id.*

### 1. Grounds for Termination: Abandonment

As a threshold event, S.M. alleged B.W. "has abandoned the child," under section 600A.8(3). B.W. contends the district court erred in finding S.M. proved that allegation by clear and convincing evidence. Abandoning a child means rejecting "the duties imposed by the parent-child relationship" while being able to

provide for the child Iowa Code § 600A.2(20). Section 600A.8(3)(a)(1) sets out the proof required to show that a parent has abandoned a child who, like O.W., was under six months old at the time of the termination hearing. As discussed above, abandonment cannot be proven if the parent does all of the following:

> (a) Demonstrates a willingness to assume custody of the child rather than merely objecting to the termination of parental rights.
> (b) Takes prompt action to establish a parental relationship with the child.
> (c) Demonstrates, through actions, a commitment to the child.

Iowa Code § 600A.8(3)(a)(1).

When deciding whether the caveats of paragraph (1) are met, the court "may consider" these six factors:

> (a) The fitness and ability of the parent in personally assuming custody of the child, including a personal and financial commitment which is timely demonstrated.
> (b) Whether efforts made by the parent in personally assuming custody of the child are substantial enough to evince a settled purpose to personally assume all parental duties.
> (c) With regard to a putative father, whether the putative father publicly acknowledged paternity or held himself out to be the father of the child during the six continuing months immediately prior to the termination proceeding.
> (d) With regard to a putative father, whether the putative father paid a fair and reasonable sum, in accordance with the putative father's means, for medical, hospital, and nursing expenses incurred in connection with the mother's pregnancy or with the birth of the child, or whether the putative father demonstrated emotional support as evidenced by the putative father's conduct toward the mother.
> (e) Any measures taken by the parent to establish legal responsibility for the child.
> (f) Any other factors evincing a commitment to the child.

Iowa Code § 600A.8(3)(a)(2)(a)–(f).

The district court analyzed these factors before deciding that, viewing the record as a whole,

[S.M.] proved by clear and convincing evidence that [B.W.]'s actions do not establish . . . a willingness to assume custody of the child, financially or personally. The evidence demonstrated he failed to take prompt action to establish a parental relationship with the child, and he did not make a commitment to the child. While his actions post-birth may suggest his willingness to accept his parental duties, he abandoned the child during pregnancy.

In contesting the district court's finding of abandonment, B.W. emphasizes his claim that he "reasonably believed the pregnancy had ended when C.P. told [him] that there was nothing left for him to worry about and demanded he never contact her again." He then points to two cases where we held that abandonment under section 600A.8(3)(a) was not proven by clear and convincing evidence, which he asserts are analogous to this case. *See In re B.G.E.*, No. 22-0726, 2022 WL 10802708 (Iowa Ct. App. Oct. 19, 2022); *In re N.J.W.*, No. 07-0146, 2007 WL 3085876 (Iowa Ct. App. Oct. 24, 2007).[10]

S.M. counters that "clear and convincing evidence showed B.W. abandoned [O.W.] within hours of learning he was going to be a father." She distinguishes B.W.'s authorities, arguing that unlike the father in *B.G.E.*, who stated his willingness to raise the child after he found out the mother was pregnant and made efforts to ask about the mother and child during the pregnancy, B.W. suggested that C.P. get an abortion and never asked about the pregnancy after their relationship ended. *See* 2022 WL 10802708, at *1–2. And unlike the father in *N.J.W.*, who repeatedly tried to communicate with the mother during her

---

[10] B.W. also highlights *In re M.H.-T.*, No. 16-1373, 2016 WL 7394782 (Iowa Ct. App. Dec. 21, 2016), where we affirmed the denial of a mother's petition to terminate the father's parental rights after he had demanded that she have an abortion. But in that case, the mother petitioned under a different paragraph because the child was three years old at the time of the proceedings. *See* Iowa Code § 600A.8(3)(b). So we do not find its analysis persuasive.

pregnancy, B.W. did not try to contact C.P. after their last conversation in June 2024. *See* 2007 WL 3085876, at *1.

In deciding whether S.M. proved abandonment, we start with the first caveat for the parent under section 600A.8(3)(a)(1). B.W. urges that since learning of O.W.'s birth, he has tried to demonstrate his willingness to assume custody. *See* Iowa Code § 600A.8(3)(a)(1)(a). Indeed, B.W. presented evidence that after receiving notice of the petition, he purchased baby supplies, took a parenting class, child-proofed his home, and made plans with his family members to assist with childcare while he is working.

In defending the court's finding of abandonment, S.M. argues that B.W.'s actions come too late and do not show a genuine commitment to being a father. S.M. emphasizes B.W.'s statement to C.P. after learning she was pregnant that "it might be easier" if she had an abortion, along with his failure to support C.P.'s pregnancy or assume the duties of a parent before O.W.'s birth. She contends B.W. cannot justify his "complete abandonment" of the child between April 2023 and January 2024, when he was served with the petition. And, according to S.M., even after learning of O.W.'s birth, B.W. did not do enough to show his willingness to assume custody of the child.

As for the second caveat, B.W. urges that he tried to establish a parental relationship with O.W., but S.M.'s actions prevented him from doing so. *See* Iowa Code § 600A.8(3)(a)(1)(b). Neither S.M. nor C.P. notified him about O.W.'s birth or his potential adoption. S.M. placed O.W. with the prospective adoptive parents in New York City shortly after his birth. Given the distance, B.W. asked "to set up video call visits, beginning as soon as possible, with the family in New York so that

he can meet his son and get updates." But S.M.—in consultation with GAL Reimer—rejected that request, expressing her confidence that B.W.'s rights would be terminated. B.W. also notes that after receiving the petition, he promptly arranged for DNA paternity testing to confirm that he was O.W.'s biological father and he filed a custody action to seek legal custody of O.W.[11]

In addressing the second caveat, S.M. returns to B.W.'s reaction to C.P.'s pregnancy: "B.W. did not take any action to establish a parental relationship with the unborn child." S.M. emphasizes that B.W. "did not check on C.P., ask about the pregnancy, go to the appointments, provide any support, or file a notice with the putative father registry." As for B.W.'s actions after learning that he had a son, S.M. acknowledges that he requested to take custody of O.W. and asked to have video calls with him. But S.M. claims that "B.W. has never taken any actions that could establish a parental relationship" with the child, and his "actions are not genuine attempts to form a relationship with a baby."[12]

As for the third statutory caveat, B.W. urges that all his actions since being served with the termination petition show his commitment to raising his son. *See* Iowa Code § 600A.8(3)(a)(1)(c). He excuses his lack of interest in parenting before O.W. was born, insisting that he "reasonably and actually believed" that C.P. terminated her pregnancy based on her statements and conduct. From there,

---

[11] B.W. testified that he started a custody case. But we have no documentation of that filing in our record.

[12] In oral argument, S.M. criticized B.W. for not flying to New York City to meet O.W. But we question whether S.M. and GAL Reimer would have approved a request for an in-person visit when they categorically rejected his more modest request for a virtual visit. What's more, S.M. declined to share the adoptive parents' contact information with B.W.'s lawyer when arranging the DNA test.

he contends that we should limit our analysis of the section 600A.8(3)(a)(1) factors to the period following service of the petition in early January 2024.

As with the other factors, S.M. places greater weight on B.W.'s conduct before O.W. was born. She maintains that B.W.'s "actions upon learning of the pregnancy are important and relevant" to the abandonment question. S.M. argues that B.W. failed to take actions demonstrating a commitment to the child during C.P.'s pregnancy, such as assisting with C.P.'s medical expenses or providing her emotional support. *See* Iowa Code § 600A.8(3)(a)(2)(d).

Before we go further, B.W. contends that because S.M. did not prove by clear and convincing evidence that he failed to meet any of the three section 600A.8(3)(a)(1) caveats, we need not analyze the permissive factors under section 600A.8(3)(a)(2). *See N.J.W.*, 2007 WL 3085876, at *4 ("If the three requirements are conclusively met, there is no need to venture into the six additional considerations."). After weighing the parties' vehement back-and-forth on the paragraph (1) caveat, we decline B.W.'s invitation to ignore the factors in paragraph (2). Unlike the record in *N.J.W.*, the record here leaves considerable doubt whether B.W.'s actions have shown his commitment to the child. So, like the district court, we believe considering the other six factors is critical to deciding whether B.W. abandoned O.W.

As we analyze those six factors, we hope to mediate between B.W.'s focus on the period after O.W.'s birth and S.M.'s focus on his negative reaction to C.P.'s pregnancy. On the one hand, in deciding a claim of abandonment, we may consider a putative father's conduct toward the child's mother during her pregnancy. Iowa Code § 600A.8(3)(c). "The statute clearly expects a parent to

assume the parental role when he learns he is the father of a baby." *In re C.W.*, No. 22-0166, 2022 WL 3420902, at *4 (Iowa Ct. App. Aug. 17, 2022) (quoting *In re R.L.H.*, No. 11-0760, 2012 WL 666741, at *2 (Iowa Ct. App. Feb. 29, 2012)). On the other hand, we "should look at the evidence as a whole, and not isolate the period of [the mother's] pregnancy." *See In re B.G.S.*, No. 03-1272, 2004 WL359528, at *2 (Iowa Ct. App. Feb. 27, 2004).

Turning to the first permissive factor, we consider B.W.'s fitness and ability to assume custody of O.W., including whether he timely demonstrated a personal and financial commitment to the child. *See* Iowa Code § 600A.8(3)(a)(2)(a). After our de novo review of the record, we have concerns about B.W.'s ability to safely parent. The record shows that he has been involved with illegal drugs for more than seven years. He acknowledged at trial that he had drug-related convictions in 2017 and 2018. As part of his sentence, he was ordered to obtain a substance-use evaluation. He recalled attending a few therapy sessions. Yet he continued to use and distribute illegal drugs. In discovery, B.W. professed to having stopped using illegal drugs nine months earlier, but his communications with a friend contradict that claim. The district court doubted his veracity on this point. We defer to that credibility finding.

Beyond his substance use, how B.W. has mishandled his mental health is troubling. As the district court recounted in its order, B.W. testified that in late 2022 he "had been suicidal and was placed on prescription medication for his condition." But without consulting his doctor, B.W. abruptly stopped taking his medication in March 2023. He admitted that "going cold turkey probably did mess up my brain a little bit." He suffered withdrawal while living with C.P., and his poor medication

management affected his demeanor and his memory of events from that time. He testified that he had not sought mental-health treatment since then.

What's more, we do not believe that B.W. timely demonstrated a personal or financial commitment to raising a child. On the personal side, we don't doubt B.W.'s subjective desire to be part of O.W.'s life since he discovered he was a father. When asked why he is pursuing a dismissal of the termination, B.W. answered: "I very much want to raise my kid." But a parent's subjective intent "unsupported by evidence of acts . . . manifesting such intent" does not prevent a finding of abandonment. Iowa Code § 600A.8(3)(c). We recognize that B.W.'s "actions were limited by the speed of the termination proceedings." *See B.G.E.*, 2022 WL 10802708, at *3. But his conduct before learning of O.W.'s birth reflects indifference rather than commitment. At the core of this conclusion is B.W.'s failure to verify or even attempt to verify if C.P. had carried through with her plan to have an abortion, particularly because he intended to supply the funds for the abortion. And even though C.P. told him to "get away from me forever," and the pregnancy was "nothing for you to worry about," expressing that she had "taken care of it," the district court found B.W. "took the easy way out because he did not want to be a father." As the district court found, B.W. simply "checked out" after he and C.P. separated. In doing so, he demonstrated a personal indifference to the pregnancy. Even after he learned of the child's birth, B.W. made no financial commitment to O.W. beyond possibly purchasing baby supplies.[13]

---

[13] B.W.'s bank records did not show that he personally paid for the nursery equipment, but he testified that working as a restaurant server, he survived "mostly on cash."

On the second factor, we find it difficult to assess whether B.W.'s efforts to personally assume custody of O.W., after learning of his birth, were sufficient to show a settled purpose to carry out the duties of parenthood. *See* Iowa Code § 600A.8(3)(a)(2)(b). The timeframe after B.W. received the termination petition was too short for B.W. to show whether he could offer O.W. a stable home.

The third factor weighs against finding that B.W. abandoned the child. *See id.* § 600A.8(3)(a)(2)(c). For the first two of the six months before the April termination proceeding, B.W. didn't know that C.P. was still pregnant. After finding out about the birth, B.W. acted to confirm that he was the father and publicly acknowledged the fact. But the fourth factor tips toward a finding of abandonment. *See id.* § 600A.8(3)(a)(2)(d). As the putative father, B.W. did not pay for medical expenses in connection with C.P.'s pregnancy. But he did not know that C.P. incurred such expenses. Rather, the expenses that C.P. and B.W. argued about were the $1900 that she loaned him and the money she needed for an abortion. He did not provide cash for those purposes. And he did not check whether she ultimately gave birth. As for emotional support, B.W. did not encourage C.P. to have the child. When she expressed her disappointment and broke off their relationship, he respected her wish to end contact. But in doing so, he failed to discover that she did not follow through with the abortion.

On the fifth factor, B.W. bypassed measures to establish legal responsibility during the pregnancy. *See id.* § 600A.8(3)(a)(2)(e). For instance, B.W. did not register as a putative father. He explained that he did not know about the registry and did not believe that C.P. planned to have the child. While those explanations make sense on the surface, had B.W. wanted to show legal responsibility for the

child, he could have been proactive in confirming whether C.P. gave birth. Still, we do consider that once he learned of the pending termination, B.W. engaged counsel to establish his paternity and seek custody.

As for the sixth factor, we identify no other actions by B.W. exhibiting his commitment to O.W. *See id.* § 600A.8(3)(a)(2)(f). In considering this catch-all category, we realize that C.P. and S.M. did not make it easy for B.W. to be a part of O.W.'s young life. They did not tell him about the pending adoption or the child's birth. And S.M. facilitated O.W.'s move with the prospective birth parents to New York City before filing the termination petition. While these undisclosed actions limited B.W.'s ability to connect with O.W., we may not require "a showing of diligent efforts by any person to encourage the parent to perform the acts specified in paragraph 'a'" of section 600A.8(3). *Id.* § 600A.8(3)(c).

That said, there's an important distinction between declining to encourage and outright blocking actions that could show a commitment to the child. The refusal by S.M. and GAL Reimer to set up videoconferences to introduce B.W. to his son prevented the father from taking prompt action to establish a parental relationship. *See* Iowa Code § 600A.8(3)(a)(1)(b). So, we find that B.W. met the requirement under paragraph (b).

But we reach a different decision under paragraphs (a) and (c). S.M. offered clear and convincing evidence that B.W. neither demonstrated a willingness to assume custody of the child nor demonstrated, through actions, a commitment to the child. *See id.* § 600A.8(3)(a)(1)(a), (c). Soon after finding out that C.P. was pregnant, B.W.—in his own words—panicked and told C.P. that "it might be easier" if she had an abortion. He then moved out and never confirmed

that C.P. followed through with her intent to "take care of" getting an abortion herself. And he continued to use and sell illegal drugs after learning of C.P.'s pregnancy. We find his conduct was a rejection of the duties imposed by the parent-child relationship. Iowa Code § 600A.2(20). To be sure, we are not saying that B.W. could not have had a change of heart and acted to show his commitment to raising a child. As our supreme court recently noted, "later conduct can negate what might otherwise be a finding of abandonment at least in some instances." *In re J.V.*, 13 N.W.3d 595, 603 (Iowa 2024) (quoting *In re J.V.*, No. 23-0579, 2024 WL 1296278, at *7 (Iowa Ct. App. Nov. 8, 2024) (Langholz, J., dissenting)). But when B.W. never checked on the status of C.P.'s pregnancy, he left himself too little time to change course and demonstrate his willingness and ability to assume custody of the child.

After giving appropriate weight to the district court's thorough factual findings, we affirm its finding of abandonment.

## 2. Best Interests of the Child

Having found clear and convincing proof that B.W. abandoned O.W., we move to the second question: Was termination in O.W.'s best interests? *See* Iowa Code § 600A.1(1) ("The best interest of the child subject to the proceedings of this chapter shall be the paramount consideration in interpreting this chapter."). While our paramount consideration is the child's best interests, we must also give due consideration to the interests of the parents. *Id.*

In a private termination proceeding:

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed

the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

*Id.* § 600A.1(2). Our supreme court has also borrowed from the statutory best-interests framework in Iowa Code section 232.116(2) in private termination proceedings. *See In re A.H.B.*, 791 N.W.2d 687, 690 (Iowa 2010). Applying that framework, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

B.W. argues that S.M. cannot overcome the presumption that O.W.'s best interests are served by parental custody. *See Northland v. McNamara*, 581 N.W.2d 210, 212 (Iowa Ct. App. 1998) ("The law raises a strong presumption that the child's welfare will be best served in the care and control of its natural parents."). He urges that his past drug use alone does not render him an unfit parent. He also contends that the district court "incorrectly applied the standard for best interest of the child by weighing the fitness of the biological parents versus the prospective adoptive parents."[14]

S.M. responds that O.W.'s "best interest is living in a family where he has been loved and cared for from the moment they learned of his existence." S.M.

---

[14] The district court noted that the prospective adoptive parents enjoy financial security—with a net worth over $7 million. The court also quoted the clinical social worker who concluded that O.W. was "receiving affection, stimulation and nurturing in a stable, secure and loving home."

urges that we must consider B.W.'s past performance and what the future likely holds for O.W. if he is returned to his biological parents. *In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998). She emphasizes concerns about B.W.'s financial instability, record of using and selling illegal drugs, and history of untreated mental illness. Her position is echoed by GAL Reimer, who recommends continued placement with the prospective adoptive parents.

Both sides make good points. "As is often the case in the law, and especially in family and juvenile law, there are no perfect answers." *J.V.*, 13 N.W.3d at 597. We share S.M.'s unease about B.W.'s past use and sale of illegal drugs, and his history of mental illness and financial instability. Yet we recognize that we "are not free to take children from parents simply by deciding another home offers more advantages." *B.G.C.*, 496 N.W.2d at 241 (quoting *In re Burney*, 259 N.W.2d 322, 324 (Iowa 1977)). But as the situation stands with O.W., we are not taking him from B.W. The child has no relationship with B.W. and has only known his home in New York City.

On balance, we find that S.M. proved by clear and convincing evidence that going forward with adoption serves O.W.'s best interests. "[O.W.] has a loving and nurturing family that he regards as his own." *See J.V.*, 13 N.W.3d at 608. Granting this petition for termination allows the placement parents to proceed with their plan to adopt, giving O.W. stability and permanency.

**AFFIRMED.**

Buller, J., concurs; Sandy, J. dissents.

**SANDY, Judge** (dissenting).

"There's nothing for you to worry about. I've *taken* care of *it.*" (Emphasis added.) These are the words C.P. spoke to B.W. following weeks of discussion relating to their mutual agreement that C.P. would have an abortion. This exchange occurred the same day that C.P. texted B.W., "I won't be having this talk anymore[.] Please just get away from me forever." B.W. did as told and had no further communication with C.P. Yet, unbeknownst to B.W., C.P. actively and continuously lied by omission about the continuation of her pregnancy.

In my view, this decision sets a dangerous precedent for future fathers who decide to trust the express word of their pregnant romantic partners and future mothers who expect those future fathers to trust them and respect their boundaries. Our case law establishes that one parent's alienation of another cannot be used as a cudgel to strip the other parent of their place in the child's life. *See In re K.P.*, No. 14-2068, 2015 WL 4644800, at *3 (Iowa Ct. App. Aug. 5, 2015). And there is irony in Iowa laws holding fathers responsible for prenatal decisions that we have told them they have no legal right to decide. *See* Iowa Code § 600B.1 (2024); *Plowman v. Fort Madison Cmty. Hosp.*, 896 N.W.2d 393, 413 (Iowa 2017).

## I.    C.P.'s Actions During the Pregnancy

In Iowa, fathers "have a voice in reproductive decisions," but "the ultimate decision to terminate a pregnancy belongs to the mother." *Plowman*, 896 N.W.2d at 413. "Although the father has no legal right to compel or prevent an abortion, he does have an interest in participating in decisions regarding family planning." *Id.* Here, C.P. took B.W.'s family planning interest away by keeping her continued

pregnancy secret. C.P. and B.W. made the mutual decision to abort their child. C.P. changed her mind.

But the problem is not that C.P. changed her mind and gave birth—such was a courageous act that I in no way criticize. The problem is that she failed to inform B.W., and in so doing, actively concealed the child's existence while knowing B.W. believed the baby had been aborted—that is fraud. Worse yet, while pregnant, C.P. actively sought and planned for the child to be adopted by a couple from New York City. And by intention, that was all conducted behind B.W.'s back. Of course, termination of B.W.'s parental rights would have had to first occur to allow for the adoption—yet they all laid in wait. Meanwhile, C.P. accepted financial payments from the adoptive couple. Upon the child's birth S.M.[15] took immediate custody of the child and restricted any access by B.W.[16] Following birth the prospective adoptive couple—with permission of the custodian—took physical possession of the baby and left for New York City. The child has not returned since. By design, B.W. had no knowledge of any of this plan. It was explicitly orchestrated with deception from the inception.

If C.P. had ultimately decided to give birth and subsequently parent the child, there would be no suggestion that she abandoned her child—a benefit that we now deny B.W. as the father. Instead, C.P. secretly planned for the adoption

[15] S.M. is an Iowa attorney who acted as legal custodian to effectuate the transfer of possession of the child to the adoptive couple immediately after the child's birth. S.M. acted as Petitioner in the termination of parental rights (TPR) and the appeal. A separate attorney represented the child as guardian ad litem (GAL) at the TPR trial.

[16] One of the prospective adoptive mothers testified she was aware B.W. was denied visits but blamed that denial on her attorney. Meanwhile, she also testified that her and her spouse "love [C.P.]" and "consider her part of [their] family."

of the child by a couple living across the country. She secretly arranged for that adoption despite knowing that doing so would require the termination of B.W.'s parental rights. C.P. knew that she could accomplish this because B.W. would have no reason to reach out to her, having lied to him, told him never to speak to her again, and blocking him on Facebook.[17] Immediately following the child's birth, C.P. signed a form providing her consent for S.M. to act as the child's legal custodian for adoptive placement. The release stated that B.W. was the child's father, but with S.M. and C.P having made no effort to contact him, B.W. of course did not sign it. Those actions directly demonstrate C.P.'s intent to act without B.W.'s consent.

C.P. had no desire to contact B.W. again until he filed his answer to the termination petition. Mere hours after that filing, she unblocked him on Facebook so that she could tell him, "I will do everything to make sure you never see that baby . . . . Don't you dare take that baby from that couple[.] You could never do what they can for him[.] Fuck you from the bottom of my heart." That interaction succinctly tells us everything we need to know as it relates to the issue of abandonment. Even if B.W. had reached out to C.P. during her pregnancy, she was resolutely determined to ensure that he had no place in the child's life. I do not see any alternate reality where C.P. would have been supportive of B.W. parenting the child.

---

[17] B.W. testified that he tried to reach out to C.P. on Facebook to pay her money he owed her but could not send a message due to C.P. having blocked him.

**II. Grounds for Termination: Abandonment**

    **A. Section 600A.8(3)(a)(1)**

I would not find that B.W. has met the conditions for abandonment under section 600A.8(3)(a)(1). "I remain puzzled about how a trial court can find it highly probable that father reasonably relied upon abortion lies to his detriment but then find that father should have discovered those lies with reasonable diligence . . . ." *In re Adoption of A.A.T.*, 196 P.3d 1180, 1219 (Kan. 2008) (Nuss, J., dissenting) (internal citations omitted). The majority accepts that S.M. and the GAL acted in concert to prevent B.W. from having contact with the child. But they also state he has not done enough to demonstrate willingness to assume custody or a commitment to the child and that, by not following up with C.P. during her pregnancy, he left himself too little time to change course and demonstrate his willingness and ability to assume custody of the child.

Respectfully, I do not understand how, in this particular case and under these particular facts, we could find B.W. met the requirements under section 600A.8(3)(a)(1), paragraph (b) but not under paragraphs (a) and (c). The only period during which B.W. knew he was a father was the same period during which this court recognizes that S.M and the GAL prevented him from contacting the child.

Thus, we must come back to B.W.'s actions during the pregnancy: his mutual agreement with C.P. that she should have an abortion; his act of respecting C.P.'s wish to end contact; and his failure to discover C.P. was still pregnant after she lied to him. Due to C.P.'s deceptions, I do not believe S.M. presented clear and convincing evidence. S.M.'s obstruction of B.W.'s attempts to contact his son,

the speed with which the petition was filed eight days after birth, and most troubling, the clandestine pre-birth plotting for the child's adoption, do not provide us with enough history during the child's life to say that B.W. abandoned the child.

**B. Section 600A.8(3)(a)(1)(2)**

Consideration of the permissive statutory factors also weigh against abandonment. S.M. makes reference to B.W.'s past substance use and mental health struggles. That may speak in part to his fitness but, considering he has not been referred for substance-use treatment, past drug use alone does not warrant a finding of abandonment. Nor are there any arguments made that B.W.'s alleged abandonment results from his mental health struggles. Instead, those struggles are used as a justification for the termination unrelated to any allegation of abandonment. This is not a chapter 232 termination proceeding and the child has never been adjudicated a child in need of assistance. B.W.'s past drug use or mental-health issues (all while he had no knowledge of a child) do not merit termination under the grounds for abandonment and are not especially informative in relation to the first permissive factor. S.M.'s reliance on this factor appears largely premised on the shakiness of the other factors and an attempt to juxtapose B.W. with the "clean" adoptive couple from New York City.

On the second factor, the majority recognizes that, upon being informed he was a father, B.W. took affirmative steps to assume the duties of being a parent. But they dismiss those efforts, finding the timeframe after B.W. received the termination petition was too short for B.W. to show whether he could offer O.W. a stable home. The way I see it, it would be difficult to assess any person's intent to parent when that person has no knowledge of their status as a parent until they

are served with a petition to terminate their parental rights. C.P.'s deceptions prevent us from fairly assessing that intent after she decided to go forward with carrying the child to term. The only reliable indicators available to us of B.W.'s intent are his actions upon being served the termination petition.

And the fourth factor, whether B.W. helped pay for medical expenses, is not especially informative here. Having prevented B.W. from acquiring any knowledge that her pregnancy would continue, he had no opportunity to contribute once she definitively decided to carry the child to term. Thus, he could not have contributed to any medical expenses for the pregnancy.

That leaves us with this court's criticism of B.W.'s failure to register as a putative father as a "measure[ ] to establish legal responsibility during the pregnancy" under the fifth factor. I do not see how this is a reasonable means for B.W. to have furthered the factor of establishing legal responsibility for the child. The putative father statute only applies to those who indeed know they are or will be a father. *See* Iowa Code § 144.12A. It is axiomatic that the word "father" necessitates offspring. Why would one register as a putative father when they do not believe they have offspring?

As with most of the other permissive factors, this criticism mostly serves to once again condemn B.W. for not continuing to harangue C.P. during the pregnancy he believed she had terminated. That he could have "done more". But, by "doing more" he would have not adhered to her directive: "I won't be having this talk anymore[.] Please just get away from me forever." And why would he? If he honestly believed she had terminated the pregnancy, what further ties does he have with C.P. that would necessitate communication? We already know B.W.

immediately contested the petition to terminate his parental rights, the service of which is also the way in which B.W. was informed he was a father. I do not see how B.W.'s registration as a putative father would do more to establish legal responsibility than the intense litigation in which he is already engaged.

As to the sixth factor, I again highlight the mere eight days that passed between the child's birth and B.W.'s simultaneous discovery that he was a father and that a petition to terminate his parental rights had been filed. S.M. very expressly ensured that B.W. would have no other opportunities to "evinc[e] a commitment to the child." Iowa Code § 600A.8(3)(a)(2)(f). Again, not only did she immediately file this action but she prohibited any parental action by B.W. outside of this litigation. The child was already in New York City. In all candor, this termination petition and abandonment action commenced with C.P.'s last text to B.W.

And as I explained previously, C.P.'s deceptions during the pregnancy prevent anyone from knowing how B.W. would have reacted once C.P. definitively informed him she was keeping the baby. The majority refers to B.W.'s fear and panic upon learning C.P. was pregnant while also recognizing that "later conduct can negate what might otherwise be a finding of abandonment at least in some instances." *In re J.V.*, 13 N.W.3d 595, 603 (Iowa 2024) (quoting *In re J.V.*, No. 23-0579, 2024 WL 1296278, at *7 (Iowa Ct. App. Nov. 8, 2024) (Langholz, J., dissenting)). Yet if C.P. had kept the child, no one would argue that she abandoned it—because through her decision to give birth she would have shown a commitment to the child and willingness to assume custody. But here C.P.'s

fraud ensured B.W. would never be afforded the same opportunity as her to walk back his agreement to the abortion.

Giving the father such an opportunity is extremely valuable because he does not hold the same decision-making rights that the woman does during a pregnancy. To state the obvious, he is not giving birth. Thus, under these facts, we are left only with B.W.'s post-birth conduct as a reliable period during which we can gauge his willingness to assume custody or demonstrate a commitment to the child.

Finally, I would like to address the district court's credibility finding upon which the majority relies. *See In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020) ("Although we are not bound by them, we give weight to the trial court's findings of fact, especially when considering credibility of witnesses." (citation omitted)). Without explicitly saying it, an underpinning of both the district court order and majority opinion is that B.W. believed what he wanted. For example, B.W. "took the easy way out because he did not want to be a father," and B.W. simply "checked out" after he and C.P. separated. I find such a finding to be unreasonable. B.W. is faulted for taking C.P. at her literal word. No doubt B.W. "checked out" of his *relationship* with C.P. but he could not "check out" of a *child* he did not know existed. And of course, both C.P. and B.W. "checked out" of their relationship with one another—that's what happens when couples break up.

My review of the record does not lead me to the same conclusion that B.W. "checked out" or "took the easy way out," and I don't know what more he could have done given C.P.'s deceit and directive to leave her alone.

### III.  Best Interests of the Child

Our supreme court has long held that "[t]here is a rebuttable presumption that [a] child's best interests are served by parental custody."  *In re K.C.,* 660 N.W.2d 29, 32 (Iowa 2003).  But the presumption in this case appears to be flipped.  B.W. has not been treated as an individual presumed to be entitled to parental custody.

Having found B.W. has not abandoned the child, I would not reach the best interests analysis.  But even if I accepted the majority opinion's abandonment holding, I would find that termination is not in the child's best interests.  "[T]he law raises a strong presumption that the [child]'s welfare will be best served in the care and control of the natural parents."  *Stanley v. Aiken*, No. 09-0723, 2010 WL 2602172, at *4 (Iowa Ct. App. June 30, 2010) (citation omitted).

Any holding that termination is in the child's best interest appears to start at the presumption that B.W.'s parental rights are his duty to prove to the court— noting his past substance use and financial instability are outweighed by the adoptive parents' stability.  While the majority cites that it cannot simply "weigh[ ] the fitness of the biological parents versus the prospective adoptive parents," that appears to be exactly what occurred here.

Indeed, our court will favor terminating parental rights where "unresolved, severe, and chronic drug addiction" goes untreated and a parent engages in "denial of drug use in the face of credible evidence to the contrary."  *In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012).  But that is not alleged here.  B.W. does not deny past substance use.  Although the court found B.W.'s testimony that he quit using drugs nine months before trial to not be credible, there are no allegations that his

drug use is an "unresolved, severe, and chronic drug addiction." *See id.* And he testified that he had removed "anything that was drug-related" from his home. Absent a founded concern about severe, and chronic drug addiction, I do not agree that these facts on their own justify termination.

Indeed, adoption of a child in need of a home is a commendable action. But here, the only reason this child was in need of a home was because the mother, through deceit, concealed the existence of the child from the father to orchestrate the adoption. In so doing there is an aspect of a subtle, underhanded commercialization of this child that contributes to my unease with terminating B.W.'s parental rights in favor of the adoptive couple. Specifically, the district court's note that the adoptive couple is worth "over $7 million" and in the "past year their net worth increased $1.2 million". This particular couple's net worth and their prudent investment strategies should not play into the court's considerations beyond establishing they are financially stable enough to provide for the child. The district court's reference to the placement couple's net worth suggests that a prospective adoptive couple's chances at terminating a natural parent's parental rights should increase with every dollar invested in their private equity portfolio.

Yet the district court's note is informative as to some of the motivations behind this termination. C.P. admitted that the adoptive couple paid her money that she used for rent. While not illegal, children are not chattel and should not be treated as such. C.P.'s acceptance of money from the adoptive couple helps inform some of the lack of motivation she had to reach out to B.W.—she claims he owed her $1900 he never paid her, and the adoptive parents were willing and able to pay her nearly that for signing her parental rights away. This is part of the reason

"substantial court oversight is necessary in a voluntary-[TPR]-and-adoption scenario to ensure that the biological parents have consented to the [TPR] after being informed of the consequences thereof." *P.M. v. T.B.*, 907 N.W.2d 522, 537 (Iowa 2018) (cleaned up). Here, B.W. was given no such opportunity to consent after being informed of potential adoption and C.P. directly benefited from that lack of transparency.

"As is often the case in the law, and especially in family and juvenile law, there are no perfect answers." *J.V.*, 13 N.W.3d at 597. Where those two possible imperfect answers are to place the child with either his natural parent or strangers across the country, I would err on the side of the natural parent here. Termination is not in the child's best interest.

## IV. Conclusion

Based on B.W.'s actions after being informed his child existed, I cannot conclude that he abandoned that child. As a result, the district court's order for termination is based on B.W.'s actions during the pregnancy—a time during which the mother holds all rights to make decisions relating to the unborn child.

Any judgment of his actions during the prenatal period must be colored by that fact. The decisions were not his to make. And C.P.'s actions should inform how we evaluate our expectations for B.W. during the pregnancy. There is no dispute that B.W. displayed "indifference rather than commitment." He and C.P. agreed that she should seek an abortion. The majority rightly recognizes "that C.P. and S.M. did not make it easy for B.W.," citing their covert efforts to terminate his parental rights through adoption and facilitating the child's move across the country. But it also directly condemns B.W.'s decision to "respect [C.P.'s] wish to

end contact" because by doing so "he failed to discover that she did not follow through with the abortion."

I believe this is a dangerous message to send to the former boyfriends of pregnant women. By failing to harass the pregnant woman after the relationship ends, this case can serve as the basis for terminating that former boyfriend's parental rights at birth.

This case potentially stands for another dangerous proposition. Once a future parent makes the decision that an abortion should occur, they have abandoned the child. At least for the father, you cannot take it back. And while this case only applies to B.W., the father, why would that decision not bind the mother as well? She may be the one who makes the medical decision to birth or abort, but I see no reason why the mother should not be held to the same abandonment standard as the father. That is the core of why I dissent today. I believe this holding comes dangerously close to justifying the termination of many parents' rights—even those that ultimately step up when confronted with unexpected parenthood. I applaud B.W. for humbly recognizing that he believed he made a mistake in agreeing to an abortion and now wishes to parent. We should incentivize that type of conduct.

I respectfully dissent. Lacking clear and convincing evidence that B.W. abandoned his child, I would accordingly reverse the judgment of the district court and dismiss the petition to terminate B.W.'s parental rights.